U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED
2010 OCT 14 AM 11: 18

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

BRITTNEY VANDER HEIDEN, TRANG NGUYEN, KORY PENTLAND, ABIGAIL RIZZO, AND JONATHAN RIZZO on behalf of themselves and all others similarly situated,
Plaintiffs,

-against-

UNITED POTATO GROWERS OF AMERICA, INC.; UNITED POTATO GROWERS OF IDAHO, INC.; UNITED II POTATO GROWERS OF IDAHO, INC.; PRINCE EDWARD ISLAND POTATO BOARD; UNITED POTATO GROWERS OF CANADA; ALBERT WADA; WADA FARMS, INC.; WADA FARMS POTATOES, INC.; WADA-VAN ORDEN POTATOES, INC.; WADA FARMS MARKETING GROUP, LLC; BLAINE LARSEN; BLAINE LARSEN FARMS, INC.; POTANDON PRODUCE LLC; KEITH CORNELISON; CORNELISON FARMS, INC.; MICHAEL CRANNE Y d/b/a CRANNEY FARMS; SNAKE RIVER PLAINS POTATOES, INC.; DRISCOLL POTATOES, INC.; LANCE FUNK d/b/a LANCE FUNK FARMS; RIGBY PRODUCE, INC.; PLEASANT VALLEY POTATO, INC.; RAYBOULD BROTHERS FARMS LLC; RD OFFUTT CO.; IDAHOAN FOODS, LLC; AND BAYER CROPSCIENCE LP.,

Defendants.

Case No. 2:10-cv-244 BY [signature] DEPUTY CLERK

**COMPLAINT -- CLASS ACTION**

**JURY TRIAL DEMANDED**

Plaintiffs, on behalf of themselves and all others similarly situated, bring this action for damages, disgorgement, injunctive relief and costs of suit, including reasonable attorneys' fees, for injuries to themselves and members of the proposed Class they represent. The allegations set

forth below are based upon information and belief pursuant to the investigation of counsel, except as to those allegations regarding themselves.

## NATURE OF THE ACTION

1. Called the "OPEC" of potatoes, Defendants – members of a cartel comprised of fresh and processed potato growers in the United States and Canada, state, regional, national and Canadian cooperatives, potato seed producers and potato packers, shippers and processors – conspired to drastically reduce the supply of potatoes as early as 2004. The cartel controls 80% of the United States potato supply. Through the use of sham cooperatives and by other means, Defendants (i) agreed among themselves and with other potato growers (both members and non-members of the cooperatives) to reduce the amount of potatoes that they each grew and when they were sold; (ii) bribed, threatened and coerced potato growers to comply with the cartel's directives; (iii) monitored compliance through the use of satellite imagery, fly-overs and inspection of potato growers' confidential reports to the Farm Service Agency; and (iv) punished violators of the cartel's directives. The purpose and effect of the cartel has been to fix, raise, maintain and stabilize the prices paid for potatoes and potato products.

2. Defendants rallied support for their cartel by advising anyone concerned with the anticompetitive nature of their conduct that it was immune from antitrust scrutiny under the Capper-Volstead Act, 7 U.S.C. §§ 291-92 (1922), which provides a limited antitrust exemption to associations and cooperatives comprised of certain agricultural producers. Defendant cooperatives, however, are not genuine cooperatives engaged in the sale, marketing, processing, handling, storing, transporting or distribution of their members' potatoes. Even if the Act applied, Defendants' acts in furtherance of their conspiracy stripped them of any immunity. Defendant cooperatives and their members (i) entered into agreements with non-members and

entities that did more than simply grow potatoes, but also packed and distributed them; (ii) reduced the number of potatoes that members and non-members grew; and (iii) engaged in predatory conduct – all of which violated the Capper-Volstead Act.

## JURISDICTION AND VENUE

3. Plaintiffs' and Class Members' claims arise under § 1 of the Sherman Act (15 U.S.C. § 1) and the antitrust and consumer protection statutes and common law of Arizona, Arkansas, California, the District of Columbia, Florida, Iowa, Kansas, Massachusetts, Michigan, Minnesota, Mississippi, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wyoming. This Court has original jurisdiction over the federal claims pursuant to § 16 of the Clayton Act (15 U.S.C. § 26) and 28 U.S.C. §§ 1331 and 1337. This Court also has jurisdiction over this entire action pursuant to 28 U.S.C. § 1332(d) because one plaintiff and one defendant are citizens of different states and the amount-in-controversy sought on behalf of the Class exceeds $5 million exclusive of interest and costs. Additionally, each Plaintiff seeks the statutory or equitable remedy of disgorgement of all profits attributable to Defendants' wrongful conduct. Finally, this Court has supplemental jurisdiction over the state claims pursuant to 28 U.S.C. § 1367 because they arise out of a common nucleus of operative facts with those asserted in the federal claim in this action.

4. Venue is proper in this district of Vermont pursuant to § 12 of the Sherman Act (15 U.S.C. § 22) and 28 U.S.C. § 1391 because Defendants transact business, have agents, or may be found in this district. Further, Plaintiff Brittney Vander Heiden and Class Members reside in this district and purchased potatoes and potato products therein, and were thereby injured in this venue.

5. This Court has personal jurisdiction over Defendants because Defendants transacted business throughout the United States, including in this district, were engaged in an anticompetitive conspiracy that was directed at, and had the intended effect of causing injury to persons in the United States, including in this district, and received substantial compensation and profits from sales of such products in this district.

## INTERSTATE AND INTRASTATE TRADE AND COMMERCE

6. Defendants' activities were within the flow of, and substantially affected, interstate trade and commerce.

7. Defendants' conspiracy caused the price of potatoes and potatoes products to increase to supra-competitive levels and the quantities of potatoes and potato products sold to decrease in each and every state in the United States and in the District of Columbia.

## PARTIES

### PLAINTIFFS

8. Plaintiff Brittney Vander Heiden is a citizen of Vermont. This Plaintiff purchased potatoes and/or potato products indirectly from one or more of the Defendants or their co-conspirators for her own personal consumption during the relevant Class Period and was injured as a result of Defendants' illegal conduct.

9. Plaintiff Jonathan Rizzo is a citizen of Arizona. This Plaintiff purchased potatoes and/or potato products indirectly from one or more of the Defendants or their co-conspirators for his own personal consumption during the relevant Class Period and was injured as a result of Defendants' illegal conduct.

10. Plaintiff Trang Nguyen is a citizen of California. This Plaintiff purchased potatoes and/or potato products indirectly from one or more of the Defendants or their co-

conspirators for her own personal consumption during the relevant Class Period and was injured as a result of Defendants' illegal conduct.

11. Plaintiff Kory Pentland is a citizen of Michigan. This Plaintiff purchased potatoes and/or potato products indirectly from one or more of the Defendants or their co-conspirators for his own personal consumption during the relevant Class Period and was injured as a result of Defendants' illegal conduct.

12. Plaintiff Abigail Rizzo is a citizen of Minnesota. This Plaintiff purchased potatoes and/or potato products indirectly from one or more of the Defendants or their co-conspirators for her own personal consumption during the relevant Class Period and was injured as a result of Defendants' illegal conduct.

## DEFENDANTS

### A. United Potato Growers of America, Inc.

13. Defendant United Potato Growers of America, Inc. ("UPGA"), formed in March 2005, is a non-profit corporation, organized and existing pursuant to the laws of Utah with its principal place of business in Salt Lake City, Utah.

14. UPGA members include fresh potato growers, vertically integrated fresh potato growers (that grow, pack, process, clean, transport and sell potatoes), potato seed growers, dehydration processors and potato processors.

15. UPGA includes potato growers throughout the United States and ten cooperatives: United At-Large Co-op; United Fresh Potato Growers of Colorado, Inc.; United Potato Growers of Idaho, Inc.; Kern Produce Shippers; United Fresh Potato Growers of the Klamath Basin, Inc.; United Potato Growers of Montana, Inc.; Red River Valley Fresh Potato Growers Cooperative;

United Southwest Potato Growers, Inc.; United Fresh Potato Growers of Washington/Oregon; and United Potato Growers of Wisconsin.

16. UPGA's website states that since 2008, UPGA has operated a United Potato Partners sponsorship program which "supports the underwriting of [its] databases, administration and educational seminars. The seminars provide a means for direct, two-way communication with potato growers."

17. UPGA does not market, distribute, wash, grade, package, store, transport or sell its members' potatoes.

**B. United Potato Growers of Idaho, Inc.**

18. Defendant United Potato Growers of Idaho, Inc. ("UPGI") f/k/a United Fresh Potato Growers of Idaho, is a corporation organized and existing pursuant to the laws of Idaho with its principal place of business in Idaho Falls, Idaho.

19. UPGI is a founding member of UPGA.

20. UPGI does not market, distribute, wash, grade, package, store, transport or sell its members' potatoes.

**C. United II Potato Growers of Idaho, Inc.**

21. United II Potato Growers of Idaho, Inc. ("UPGI II") is a corporation, organized and existing pursuant to the laws of Idaho with its principal place of business in Idaho Falls, Idaho.

22. UPGI II owns processing plants and processes UPGI's members' potatoes.

**D. Prince Edward Island Potato Board**

23. The current Prince Edward Island Potato Board ("PEIPB") was installed in July 1990 to operate as a producer-controlled Board under the Natural Products Marketing Act. PEIPB is located in Charlottetown, Prince Edward Island, Canada.

24. PEIPB supports the potato industry in Prince Edward Island by developing and expanding domestic and international markets through the promotion of seed and tablestock potatoes.

25. According to its website, PEIPB promotes and provides high seed quality for the industry; supplies potato producers, dealers and exporters with strategic production and marketing information in order to promote market-directed production; assists with negotiation of processing contracts on growers' behalf; lobbies federal and provincial governments to ensure that adequate programs and policies are in place to assist in the industry's development; promotes environmentally sustainable potato production practices; licenses dealers and exporters to market Prince Edward Island potatoes; and provides leadership to enhance the viability and competitiveness of the Prince Edward Island potato industry.

26. PEIPB does not market, distribute, wash, grade, package, store, transport or sell its members' potatoes.

**E. United Potato Growers of Canada**

27. United Potato Growers of Canada ("UPGC") was formed in February 2006 in conjunction with UPGA and represents 98% of Canadian potato acreage.

28. UPGC is a non-share, not-for-profit corporation established under the Canada Corporations Act, whose membership consists of potato organizations, specifically the potato boards, agencies, or commissions of each province.

29. UPGC's mission is to "[p]rovide potato industry information, intelligence, and analysis, that allows producers to make timely informed production and marketing decisions."

30. Members of UPGC include PEIPB; the Ontario Potato Board; Potato Growers of Alberta; BC Vegetable Marketing Commission; Fédération des Producteurs des Pommes de Terre du Québec; Keystone Potato Producers Association; and Potatoes New Brunswick f/k/a Pommes de Terre Nouveau-Brunswick.

31. UPGC works closely with two United States potato organizations: UPGA and Potato Marketing Association of North America. UPGC has a data sharing arrangement with UPGA.

32. UPGC does not market, distribute, wash, grade, package, store, transport or sell its members' potatoes.

**F. Bayer CropScience LP**

33. Bayer CropScience LP ("Bayer CropScience") is a corporation organized, existing and doing business under the laws of North Carolina with offices and its principal place of business located in North Carolina.

34. Bayer CropScience AG (the parent company of Bayer CropScience LP) has a global workforce of about 18,000 and is represented in more than 120 countries.

35. Bayer CropScience sponsored UPGA's United Potato Partners program as of 2008, which continued in 2009 and 2010.

36. According to UPGC's website, "the Bayer CropScience - United Potato Partners sponsorship is one that furthers sustainable agriculture and fosters a strong world food supply." UPGA's website describes Bayer CropScience's involvement as support of "the underwriting of

United's databases, administration and educational seminars. The seminars provide a means for direct two-way communication with potato growers."

37. Bayer CropScience is a key presenter at United Potato Partner seminars held in major potato growing regions. Growers at these free seminars learn the economic tools to better target prospective markets and meet customers' needs.

38. According to Bayer CropScience, "this partnership not only underwrites the costs of the seminars, but [provides] additional income to help UPGC fulfill its Mission Statement[.] Corporations that sign an agreement with [UPGC] receive an immediate inside track for promoting their products to growers."

**G. Wada Farms, Inc.**

39. Defendant Wada Farms, Inc. is a corporation, organized and existing pursuant to the laws of Idaho with its principal place of business in Pingree, Idaho.

40. Defendant Wada Farms Potatoes, Inc. is a corporation, organized and existing pursuant to the laws of Idaho with its principal place of business in Pingree, Idaho.

41. Defendant Wada-Van Orden Potatoes, Inc. is a corporation, organized and existing pursuant to the laws of Idaho with its principal place of business in Blackfoot, Idaho.

42. Defendant Wada Farms Marketing Group, LLC is a limited liability company, organized and existing pursuant to the laws of Idaho with its principal place of business in Idaho Falls, Idaho.

43. Defendants Wada Farms, Inc., Wada Farms Potatoes, Inc., Wada-Van Orden Potatoes, Inc. and Wada Farms Marketing Group, LLC are hereinafter collectively referred to as "Wada Farms."

44. Defendant Albert Wada ("Wada") is a citizen of Idaho.

45. Wada is, and at all relevant times has been, an officer or director of each of the companies comprising Wada Farms. At all relevant times, Wada has been an officer or director of UPGA, UPGI and UPGI II. Wada is a founding member of UPGA, UPGI and UPGI II.

46. Wada Farms grows fresh and processed potatoes, seed and commercial wheat, alfalfa, sugar beets, and hybrid canola seed on 30,000 irrigated acres in Idaho. It has a fresh potato, onion and sweet potato marketing group.

47. Wada Farms also packs and trucks its own potatoes and potatoes produced by others. It owns a 140,000 square foot potato packing facility and a trucking company. Wada Farms has potato co-packing agreements with entities in California, Washington, Idaho, Colorado, Nebraska, North Dakota, Wisconsin, Illinois, Michigan, Kentucky, Alabama, Georgia, New York, Pennsylvania, Maine, Missouri, Florida, North Carolina, New Jersey, Ohio and Massachusetts.

**H. Blaine Larsen Farms, Inc. and Blaine Larsen**

48. Defendant Blaine Larsen Farms, Inc. ("Larsen Farms") is a corporation organized and existing pursuant to the laws of Idaho with its principal place of business in Hamer, Idaho.

49. Larsen Farms grows, packs and distributes potatoes from farmland and facilities in Idaho, Nebraska and Colorado. It sells potatoes to retail and food-service customers worldwide. It also makes processed potato products (*e.g.*, crushed, diced, dehydrated, flaked and sliced potatoes), which it sells and supplies to food processors.

50. Defendant Blaine Larsen ("Larsen") is a citizen of Idaho.

51. Larsen was a founder of UPGI and a board member of UPGI during the Class Period.

**I. Potandon Produce LLC**

52. Defendant Potandon Produce LLC ("Potandon") is a limited liability company, organized and existing pursuant to the laws of Idaho with its principal place of business in Idaho Falls, Idaho.

53. Potandon grows potatoes and onions on approximately 45,000 acres in Idaho. It has six packing facilities in Idaho. It sells potatoes to major retailers, club stores, wholesalers, produce distributors and restaurant chains throughout the United States or as agent of other growers.

54. Between 2002 and 2006, Potandon took over the sales and marketing activities of several Idaho potato growers, including Idaho Fresh Cooperative f/k/a Sunspiced of Idaho (which has 25,000 acres of potato farmland and 6 packing facilities in Idaho), High Country Potato and Larsen Farms.

55. Potandon has a network of more than 60 potato co-packers in 25 states and 9 in Canada.

56. Potandon is the largest marketer of potatoes in the United States controlling 25% of the supply of potatoes in Idaho and 12% of the supply in the United States.

**J. Cornelison Farms, Inc. and Keith Cornelison**

57. Defendant Cornelison Farms, Inc. ("Cornelison Farms") is a corporation, organized and existing pursuant to the laws of Idaho with its principal place of business in Rexburg, Idaho.

58. Cornelison Farms grows, packages and ships fresh potatoes.

59. Defendant Keith Cornelison ("Cornelison") is a citizen of Idaho. At all relevant times, Cornelison was an officer or director of Cornelison Farms. He is a founding member of UPGI.

**K. Michael Cranney d/b/a Cranney Farms**

60. Defendant Michael Cranney d/b/a Cranney Farms ("Cranney Farms") is a citizen of Idaho.

61. Cranney Farms grows fresh and processed potatoes, sugar beets, corn, barley and wheat.

62. Michael Cranney is a founding member of UPGI.

**L. Snake River Plains Potatoes, Inc.**

63. Defendant Snake River Plains Potatoes, Inc. ("Snake River") is a corporation organized and existing pursuant to the laws of Idaho with its principal place of business in Ucon, Idaho.

64. Snake River is a potato producer that grows, packs, stores and ships its own potatoes.

65. Snake River is a founding member of UPGI and a member of UPGA. David Beesley, its Chief Executive Officer, was a member of the UPGA executive committee during the relevant time period.

**M. Driscoll Potatoes, Inc.**

66. Defendant Driscoll Potatoes Inc. is a corporation organized and existing pursuant to the laws of Idaho with its principal place of business in American Falls, Idaho.

67. Driscoll Potatoes is a potato producer that grows, packs, stores and ships its own potatoes.

68. Driscoll Potatoes is a founding member of UPGA, and Loraine Driscoll, an officer of Driscoll Potatoes during the relevant time period, served on the board of directors of UPGA, also during the relevant time period.

**N. Lance Funk d/b/a Lance Funk Farms**

69. Defendant Lance Funk is a citizen of Idaho d/b/a Lance Funk Farms, located in American Falls where Lance Funk also resides. Lance Funk is a potato grower and founding member of UPGI.

**O. Rigby Produce, Inc.**

70. Defendant Rigby Produce, Inc. ("Rigby Produce") is a corporation organized and existing pursuant to the laws of Idaho with its principal place of business in Rigby, Idaho.

71. Rigby Produce is a potato producer that grows, packs, stores and ships its own potatoes.

72. Rigby Produce is a founding member of UPGI.

**P. Pleasant Valley Potato, Inc.**

73. Defendant Pleasant Valley Potato, Inc. ("Pleasant Valley") is a corporation organized and existing pursuant to laws of Idaho with its principal place of business in Aberdeen, Idaho.

74. Pleasant Valley is a potato producer that grows, packs, stores and ships its own potatoes.

75. Pleasant Valley is a founding member of UPGI.

**Q. Raybould Brothers Farms LLC**

76. Defendant Raybould Brothers Farms LLC is a limited liability company organized and existing pursuant to the laws of Idaho with its principal place of business in Rexburg, Idaho.

77. Raybould Brothers grows and sells fresh potatoes.

78. Raybould Brothers is a founding member of UPGI. Jeff Raybould, a member of Raybould Brothers, is an original incorporator of UPGA.

**R. RD Offutt Co.**

79. Defendant RD Offutt Co. ("RD Offutt") is a corporation organized and existing pursuant to the laws of North Dakota with its principal place of business in Fargo, North Dakota.

80. RD Offutt is one of the largest potatoes producers in the United States, owning land in excess of 50,000 acres for growing potatoes.

81. RD Offutt representatives attended meetings of UPGI and participated in its efforts to reduce the supply of potatoes.

82. In 2007, RD Offutt and UPGI II created a joint venture called North American Foods, LLC (now known as Idahoan Foods, LLC). The joint venture was created to allow potato growers to sell potatoes for processing as potato byproducts to food manufacturers.

## CO-CONSPIRATORS

83. Various individuals and entities that are presently unknown to Plaintiffs participated as co-conspirators with Defendants in the wrongful conduct alleged herein and have engaged in conduct and made statements in furtherance of the conspiracy.

## AGENTS

84. The acts alleged to have been done by the Defendants were performed by their respective officers, directors, agents, employees or representatives while actively engaged in the management, direction, control or transaction of the Defendants' business affairs.

## CLASS ACTION ALLEGATIONS

85. Plaintiffs bring this action on their own behalf and on behalf of all others similarly situated. The "Class" that is properly maintainable under Rules 23(b)(2) and (b)(3) is defined as:

> All persons or other legal entities (excluding Defendants, their officers, directors, subsidiaries or affiliates), who purchased potatoes (including products containing potatoes) indirectly in Arizona, Arkansas, California, the District of Columbia, Florida, Iowa, Kansas, Massachusetts, Michigan, Minnesota, Mississippi, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wyoming between September 1, 2004 and continuing until such time as Defendants' cartel activities and their effects cease.

86. The members of the Class are so numerous that joinder of all of them would be impracticable. The exact number of Class Members is unknown by Plaintiffs at this time, but they believe them to number in the millions.

87. Plaintiffs' claims are typical of the Class Members. Plaintiffs and all Class Members were impacted and damaged in the same manner by Defendants' wrongful conduct. Plaintiffs and the Class Members purchased potatoes and potato products at artificially inflated prices because of Defendants' wrongful conduct.

88. Plaintiffs will fairly and adequately protect the interest of the Class. Plaintiffs' interests are coincident with, and not antagonistic to, those of the Class. Plaintiffs also have retained counsel who have experience in the prosecution of complex antitrust class actions including of the type of claims alleged herein. Questions of law and fact common to the class

members predominate over questions that may affect only individual Class Members. Defendants have acted on grounds generally applicable to the entire Class. Common questions of law and fact include, but are not limited to:

a. Whether Defendants engaged in a contract, combination or conspiracy to reduce the supply of potatoes in the United States, and to raise, fix, maintain or stabilize the price of potatoes sold in the United States;

b. The duration and extent of the contract, combination or conspiracy alleged herein;

c. Whether the alleged contract, combination or conspiracy violated Section 1 of the Sherman Act;

d. Whether any of the Defendants are protected by the Capper-Volstead Act;

e. Whether Defendants violated the state statutes set forth in Count Two;

f. Whether Defendants have been unjustly enriched at the expense of Plaintiffs and the Class;

g. Whether Defendants' conduct caused the price of potatoes sold in the United States to be artificially high and non-competitive;

h. Whether Plaintiffs and Class Members were injured by Defendants' conduct; and

i. Whether Plaintiffs and Class Members are entitled to equitable and injunctive relief and the nature of such relief.

89. A class action is superior to other available methods for the fair and efficient adjudication of this litigation since individual joinder of all Class Members is impractical. The damages suffered by the individual Class Members are relatively small, given the expense and burden of individual prosecution of the claims asserted in this litigation. Thus, absent the availability of class action procedures, it would not be feasible for Class Members to redress the wrongs done to them. Even if the Class Members could afford individual litigation, the court system could not. Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and the

court system. Therefore, the class action device presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale, and comprehensive supervision in a single court.

## POTATO INDUSTRY

90. Potatoes are the most important vegetable in the diet of United States consumers. During the last twenty years, potatoes were ranked as the second most important product in United States food consumption following wheat flour.

91. Potato consumption can be divided into four general categories: (i) table stock (also known as fresh potatoes) which includes numerous varieties such as round white, round red, russet and Irish potatoes; (ii) potatoes for processing, which includes chips and shoestring, dehydrated, frozen (french fries and other forms such as patties), canned, starches and flours; (iii) other sales, including seed and feed for livestock; and (iv) non-sale uses such as shrink, loss and on-farm uses such as feed and seed.

92. Potatoes do not have ready substitutes. Consumers will not substitute other products for potatoes in response to a small price increase. Sweet potatoes and yams are not substitutes for potatoes.

93. The United States potato industry is a multi-billion dollar annual market. For example, in 2007, the United States potato market had a total production of 449 million cwt (hundredweight or 100 pounds) of potatoes and the value of production was $3.2 billion dollars. In 2008, total domestic potato production was 415 million cwt, approximately 7% below the 2007 crop levels (due to the supply reduction price-fixing scheme alleged herein). Despite the reduced production, however, overall market value of production was $3.49 billion – an increase of 13% over 2007 production values.

94. Because of good storage technology and practices, the marketing season for fall potatoes extends from July (early harvest areas) through June of the following year.

95. The storage and transportation of potatoes is not costly relative to their price. The supply of potatoes throughout the United States and parts of Canada influence the price of potatoes rather than supply in any particular region.

96. Fresh potatoes are usually sold in the open market and processed potatoes are typically sold through contracts. Processed potato contracts are usually signed prior to the planting season and specify a potato variety, quantity, and base price with incentives based on quality requirements.

97. Because of the ease of storage and transportation, potatoes can be sold both as fresh and processed. Fresh potatoes are the most valuable. Nearly two-thirds of potatoes were used for processing in 2007, with frozen french fries and other frozen potato forms being the largest segment. Table stock accounted for 27% of use, and the remainder went to feed, seed and other uses.

98. Potato growers can, and do, monitor the amount of potatoes that each of them grows through various visual surveillance methods.

99. All types of potatoes impact the price of each of them. As such, excess supply of process and seed potatoes reduces the price of fresh potatoes.

100. Many fresh potato growers (such as several of the Defendants herein) are vertically integrated and handle growing, packing, shipping, and even further processing on the farm. Many of the large potato growers also pack and ship for other growers.

101. Packing sheds generally work in conjunction with growers to wash, grade, and pack potatoes to be shipped to direct purchasers such as retailers and distributors.

102. Consumers are not sensitive to the price of potatoes, as they will not reduce the quantity of potatoes that they purchase in response to a small increase in price. Although such a price increase would amount to pennies for the retail price of potatoes or potato products, it would reap Defendants substantial additional profits. Thus, an increase in price will not produce a sufficient reduction in the quantity of potatoes sold so as to render a price increase unprofitable.

103. Defendants have reduced the quantity of potatoes that they grew during the relevant period in the face of flat input costs. In the face of declining demand and flat input costs, Defendants' supply reduction efforts have resulted in dramatic price increases during the relevant time period.

104. Potatoes are fungible commodities. There is minimal branding of potatoes. Consumers and customers do not have preferences for any particular grower's potatoes.

105. The price of potatoes represents the single most expensive input in the variable cost of producing potato products. Manufacturers of potato products cannot afford to absorb price increases and remain profitable. As a result, they typically pass on entire price increases to their customers.

## CARTEL HISTORY AND OPERATION

### A. Overview

106. Growers realized that the way to increase prices and profits was to reduce the supply of potatoes. Even in the face of declining demand, growers knew that they would be able to increase prices by controlling the supply of potatoes to reach the market.

107. Beginning in 2003 and continuing to date, the cartel controlled as much as 80% of potato production (by acreage). Defendants, in combination with these other potato growers

(non-members of the cooperatives), devised and implemented a plan to reduce the supply of potatoes for sale on the market.

108. Defendants have reduced the supply of every type of potato from every locale that might impact price. They achieved this result through, *inter alia*, supply-reduction agreements among fresh potato producers in the United States. Defendants also implemented various other measures to control the supply of seed and processed potatoes.

109. To reduce the supply of processed potatoes, Defendants had processed potato growers change the method in which they contract with food manufacturers – their customers. The processed potato growers had contracted to supply a specified quantity of potatoes. Instead, at the Defendants' insistence, the processed potato growers obtained the food manufacturers' acquiescence for contracts to specify a specific number of acres in which the potatoes grown on those acres would be supplied. This type of contract eliminated the growth of potatoes over and above the amount specified by the contracts, which had previously flooded the market and depressed potato prices.

110. Defendants were also successful in obtaining the cooperation of Canadian potato and seed potato growers to reduce the amount of potatoes they grew.

111. The cartel has been successful, drastically reducing the supply of potatoes, causing potato prices to more than double during the conspiracy, even in the face of declining demand and flat input costs.

**B. Agreements and Overt Acts**

112. In the early 2000's, in response to declining prices, Idaho potato growers (who produce approximately one-third of the potatoes in the United States) grew concerned about their profits. In 2003, several Idaho growers agreed to implement acreage reductions in order to

reduce supplies. Given the limited success of these schemes, however, one of the largest potato growers in the country, Defendant Wada, decided to form an Idaho "cooperative" with other Idaho growers in order to formalize a joint agreement between and among his competitors to reduce potato supply and fix, raise, maintain and stabilize prices.

113. Wada began realizing his expressed intent of "managing [North American] potato supply" by first seeking to organize Idaho potato growers. In late 2004, along with other Idaho potato growers, Wada co-founded United Fresh Potato Growers of Idaho ("UFPGI"), later renamed UPGI.

114. Wada called his potato price-fixing plan, "United We Stand," and openly discussed how he wanted to "unite" potato growers, "decrease competition," and "rationalize the industry" by collectively curtailing production. UPGA's website makes a similar point: "[i]n 2004, after evaluating the economic realities of the current business climate, a group of potato growers decided that long-term production and supply management are critically needed to provide stability and a reasonable return for growers."

115. The potato cartel was formed when Wada organized a meeting of Idaho potato farmers in September of 2004 to discuss how to "curb production" and "boost prices" for potatoes. At this meeting, Defendants Wada and Keith Cornelison (of Defendant Cornelison Farms) summoned 23 Idaho potato growers to an office in Blackfoot, Idaho to discuss how their collective efforts at reducing potato supplies could help fix, raise, maintain, and stabilize prices.

116. After more meetings, phone calls, and emails among these growers, the group agreed to form UPGI with the explicit goal of reducing potato supplies through various means.

117. The 23 growers in attendance at this meeting became the founders of UPGI, which filed for incorporation on November 2, 2004. At that time, the founders' operations

encompassed approximately 60% of the fresh potatoes produced in Idaho and 25% of the fresh potatoes in the United States.

118. Defendants Larsen (of Defendant Blaine Larsen Farms), Wada (of Defendant Wada Farms), and Cranney (of Defendant Cranney Brothers Farms) are the three largest growers in Idaho and among the biggest in the United States attending this meeting. They and other Idaho-based growers at this meeting became founders of UPGI and signed on to the price-fixing and capacity reduction scheme. Some meeting attendees are named as Defendants herein, including Keith Cornelison (of Cornelison Farms), David Beesley (of Snake River Plains Potatoes), Loraine Driscoll (of Driscoll Potatoes), Paul Duncan and Defendant Lance Funk (of Lance Funk Farms), Dale Mickelson (of Rigby Produce), Jeff Raybould (of Raybould Brothers Farms), Kim Wahlen (of Pleasant Valley Potato), and Blair Walker and Dick Watt (of Sunspiced Grower Cooperative).

119. UPGI's stated purpose in its Articles of Incorporation is "to stabilize potato prices and supplies in the State of Idaho and to work with similar cooperatives in other states having similar purposes."

120. In October of 2004, UPGI founders issued a press release discussing their goals of "supply management" and asked other potato growers from around the country to attend another meeting to discuss the formation of additional regional and national groups to assist in these efforts. The next cartel meeting occurred on or about November 3, 2004, at the Shiloh Inn Convention Center in Idaho Falls, Idaho – the day after UPGI's articles of incorporation were filed.

121. Growers from Colorado, Oregon, Washington, Wisconsin, and California joined the Idaho potato farmers at the meeting. Wada announced the group's supply reduction plans at

the meeting to several hundred potato farmers, which prompted a standing ovation. Many farmers signed on to the supply reduction agreement on the spot agreeing to pay annual dues ranging from about $10,000 to $500,000 depending on how much acreage each farmer utilized for growing potatoes.

122. On December 2, 2004, the 23 founding members of UPGI, all of whom had agreed to the supply management scheme, voted to move the commitment date to join the co-op to January 17, 2005 – two weeks ahead of the original membership deadline. At this point, the group already had 80% of all acres dedicated to fresh potatoes in Idaho committed to supply reductions under its membership agreements.

123. The fresh potato market is strongly affected by the processing potato and seed potato markets as they are all interrelated. Cooperation with the process and seed potato growers would also reduce the supply of potatoes and help to stabilize and increase prices. Thus, UPGI sought out groups of process and seed growers to join the cartel.

124. As of December of 2004, UPGI had negotiated "Memorandums of Understanding" ("MOUs") with the directors of every potato grower group in Idaho, including Potato Growers of Idaho ("PGI"), Potato Management Company ("PMC"), Seed Potato Growers of Idaho ("SPGI"), and the Southern Idaho Potato Cooperative ("SIPCO").

125. PGI was formed in 1968 to serve as a bargaining unit for growers in contract negotiations with potato processing companies. According to its website, "[i]n the more than 30 years since its organization, PGI's mission has evolved to include representation of growers with governmental, legislative and industry organizations. In 2000, PGI membership opted to end its role as a contract negotiator, and to focus its efforts more fully on its information and representation missions."

126. PMC was formed in 2000 by a group of Idaho potato growers and shippers to help reduce potato supplies. The group was successful in organizing various programs, including charitable donations and cattle feeding, that removed several million hundredweight of potatoes from the market. In addition, the group donated over 15 million pounds of potatoes to help reduce domestic supply.

127. SPGI is a group of seed potato growers. Seed potatoes are grown for use in planting new crops of potatoes. Once cut into sets and planted, seed potatoes grow into tablestock potato varieties. Seed potatoes themselves are not intended for human consumption.

128. SIPCO was founded in 1997 and acts as the bargaining unit for Idaho frozen process growers. SIPCO also negotiates annual contracts with Idaho and Oregon processors with the goal of providing a stable and reasonable rate of return for the Idaho frozen process grower.

129. These groups were not "Capper-Volstead cooperatives," yet UPGI collaborated and conspired with them to reduce potato supplies. Through the cooperation insured by these MOUs, the growers, shippers, and other entities working collectively with UPGI to reduce potato supplies, accounted for more than 60% of *all* Idaho potato acres (and not just the vast majority of those devoted solely to fresh potato production).

130. To achieve its supply reduction objectives, UPGI developed and started enforcing a set of programs and policies that targeted both production and marketing of fresh potatoes. UPGI employed two policies. First, before the beginning of a planting season, the potato production was controlled by enforcing an acreage management program, which was implemented through a bid buy down program. Secondly, during the potato growing season, before harvest, the production was monitored for overage and to ensure accurate yield productions were made, which was implemented through a series of field digs.

131. UPGI also executed a secondary market strategy at the beginning of 2005 that removed approximately 8% of potato stock from the market. A surplus from the 2004 fall crop was diverted to charities and food banks.

132. The "cooperatives" also participated in conference calls to share data about market conditions. The calls took place twice a week at the state level (and were later established as once a week at the national level with the formation of UPGA). Prior to a conference call, participating warehouses would log on the UPGI web-page and provide information on capacity, stocks and pack-outs. This data, along with other information (prices, trends, weather, etc.), were discussed during the conference call, and were summarized as a marketing summary posted on the internet to assist with "flow control" and prevent potatoes from being shipped when prices were too low.

133. With the understanding that these supply management techniques were necessary on more than just a regional level, UPGI used UPGA and the other co-conspirators to institute its supply-restriction techniques on a nationwide scale. Wada and his co-conspirators nationalized (and internationalized) their potato supply-restriction efforts and assisted in forming other regional and national potato "cooperatives" with this goal in mind.

134. In December of 2004, UPGI met with growers in Colorado and Wisconsin to aid in the formation of UFPG groups in those states as well. Oregon growers in Klamath basin formed another group in that state too. In February 2005, Washington growers also met to coordinate supply restrictions. Regional potato grower cooperatives were later formed in Central California, and other areas of the Southwest, Midwest, and West. As UPGA's website states, "Idaho leaders reach[ed] out to growers in other regions and invite[d] them to form their own supply-management cooperatives as part of the united effort. Soon, regional co-ops [were]

formed in Colorado, Klamath basin (on the border of California and Oregon), Washington-Oregon, and Wisconsin. (Later, growers in central California, the Southwest, Midwest and West form[ed] co-ops.)"

135. Under Wada's leadership, these regional cooperatives then met to form a national group to reduce supply throughout North America. Defendant Wada (of Defendant Wada Farms), Loraine Driscoll (of Defendant Driscoll Potatoes) and Jeff Raybould (of Defendant Raybould Brothers Farms) were UPGA's original incorporators. Tony Amstad (of Amstad Produce Inc. in Oregon), Warren Boegel (of Boegel Farms LLC in Kansas), Defendant Michael Cranney (of Cranney Brothers Farms in Idaho), Dennis Day (of Montana), Allen Floyd (of Harvest Fresh Produce in Washington), Tom Franconi (of Kern Produce Shippers in California), Dick Okray (of Okray Farms in Wisconsin), Ed Staunton (of Staunton Farms in California) and Dave Warsh (of Warsh Farm in Colorado) were UPGA's initial directors.

136. According to UPGA website,"[r]ealizing the need for national coordination, communication, data gathering and analysis, professional leadership and staff to handle the many facets and programs of the organization, United Potato Growers of America [was] formed" in March 2005. UPGA facilitated the nationwide supply-restriction campaign through its regional cooperative members (which were in turn made up of individual growers who implemented the actual supply reductions).

137. UPGA nationalized the regional supply-restriction scheme initially developed by UPGI. UPGA's mission statement read: "[w]e bring order and stability to the North American potato growing industry and increase our member potato growers' economic potential by the effective use of cooperative principles." UPGA's supply control efforts are further confirmed by

the mission statements on its own website: "Vision: We will manage United's national potato supply in order to positively affect grower profitability."

138. The UPGA's key initiatives are listed as: "United Potato Growers of America implements strategic supply management programs. Key priorities include providing planting guidelines based on sound data and historical facts; acreage verification programs; information sharing; developing strategic alliances; managing supplies; and improving grower return on investment."

139. In April of 2005, UPGA announced the first nationwide acreage buy-down program in the history. Growers were allowed to "bid" acres into the buy-down program if they agreed to plant less acreage than they did in 2004. UPGA member funds would then be used to compensate those growers who agreed to plant less. Similar programs and acreage reductions have continued to present.

140. Regarding this acreage buy-down program, Wada stated, "[t]his is a great opportunity to bring stability and rationale to our Potato Industry ... Through cooperation and unity we can and will help ourselves and each other achieve our goals. We strongly encourage all growers to take advantage of this offer while it is available and join their state or regional cooperative and the United of America Board to reduce 2005 acres."

141. Also in April of 2005, Wada traveled to Prince Edward Island in Canada to facilitate the formation and operation of a North American-wide potato cartel. The cartel would reduce potato supplies and fix potato prices across the continent.

142. In June 2005 the entire UPGA Board of Directors met with key industry leaders in Canada and the United States in Charlottetown, Prince Edward Island. More than 250 potato growers attended this meeting, who preliminarily approved the starting of a Canadian

counterpart to the UPGA, and voted to cap island potato acreage for each grower. As a result of this meeting, a meeting was held in Toronto, Canada in August 2005 with the entire UPGA board present. The meeting's outcome was the initiation of the formation of the United Potato Growers of Canada (UPGC), which joined the UPGA.

143. In June of 2005, UPGA announced that its first acreage buy-down program had been a success. Members collectively agreed to cut their crop by tens of thousands of acres to their lowest levels since 1959. Preliminary estimates showed United States potato acreage down 35,000 acres as a direct result of the UPGA's buy-down program.

144. The impact of the UPGA program was also noted at the national level. The average potato price was approximately 23% higher in 2005 relative to 2004. The United States Department of Agriculture ("USDA") concluded that this was due to the bid-buy program instituted by UPGA, which removed almost 11% of fresh potato production from the market in 2005.

145. UPGA's officers confirmed the success of their efforts. Jerry Wright, the former CEO of UPGA, stated, "due primarily to [UPGA's] three-phase supply management program implemented nationwide, growers have the highest returns ever for this time of the year .... The success of the whole program is the result of the growers' determination to solve their own problems and manage their supply."

146. On or about November 15-16, 2005, Idaho growers met to discuss 2006 crop reduction guidelines at the Red Lion Inn in Pocatello, Idaho. Joint meetings were also held with the SIPCO, U.S. Potato Board, and the Potato Marketing Company. At these meetings, UPGI members (including Defendant growers herein) and other Idaho growers agreed to plant 10% less than their 2004 base acres.

147. UPGI and UPGA also coordinated potato "flow control" to control the quantity of potatoes supplied to the market throughout a marketing year when prices were low. In Idaho, warehouses participating in the "flow control" program represented more than 75% of Idaho's potato packing capacity. Personnel at warehouses entered information on the capacity, stocks and pack-outs on the UPGI webpage on a regular basis. After weekly telephone conversations, price advisory information was then posted on the internet for members and non-members, which was then used as the pricing strategy for the coming week.

148. In order to ensure strict compliance with the supply reduction and price-fixing agreement, UPGI and UPGA conducted audits and utilized GPS, aerial photography, and satellite imaging to verify that co-conspirators had complied with the quotas and not exceeded the potato acreage upon which they agreed to grow.

149. At the beginning of the planting season, growers filled out the Planting Intention Form. On this form, the grower recorded their 2004-year base acreage and their current year planting intentions by potato variety. The Planting Intention Form was then the grower's commitment against which the grower's actual performance was evaluated. UPGA also checked farmers' acreage against the Farm Service Agency ("FSA") Form 578 (*i.e.*, a report of acreage) submitted to the federal FSA for government-support programs. Growers had to agree to allow UPGA access to these otherwise confidential submissions.

150. The UPGI's and UPGA's field representatives would review the grower's planting intention commitment, filed maps and FSA Form 578. The representative would conduct inspections of each parcel of land to verify actual plantings and reductions. The results of the audit were then reported to the Future Crop Committee and the UPGI and UPGA Boards.

151. In 2006, the fields of 25% of the general membership and of 100% of the UPGI Board members were audited, representing 65% of the UPGI's fresh potato acres. At that audit, all the audited fields were in compliance with supply reduction scheme and bid buy-down programs. The audit confirmed that the audited members of the UPGI reduced the potato acreage by more than 10% relative to the 2004-year base.

152. Any growers that "cheated" were subject to punitive measures and fines. For example, the cooperatives' bylaws allowed them to levy fines of $100 per acre against growers who violated the supply reductions.

153. The potato cartel's efforts began to see significant progress in raising prices starting in 2005 (and continuing to present), as the cartel was able to reduce potato supply. Between September of 2005 and November of 2005, potato growers received an average of $6.67 for every 100 pounds of potatoes – a nearly $4 increase from the previous year. By 2007, farmers were averaging $7.75 for every 100 pounds of potatoes. UPGA's and UPGI's potato acreage reductions and subsequent price increases carried on in to 2007, 2008, and to the present.

154. A December 2006 powerpoint presentation by then UPGA-CEO Julia Cissel at the Potato Outlook Summit entitled, "Managing Supply and Influencing Acreage," stated that a May 2006 *Spudman* magazine reader survey found that "85% of all respondents said they have seen an increase in their profits since UPGA was formed." The presentation also included the conclusions that, "Supply Management depends on YOU! 1) Manage your acres 2) Insist on reasonable returns 3) Engage and collaborate 4) Convince non-members to follow … they win too! **5) DO THE RIGHT THING!**"

155. In 2007, as reported in UPGC's summer 2007 newsletter, potato growers who belonged to UPGC and Potato Marketing Association of North America agreed to participate

with UPGA in the United Potato Partners Program. UPGC reported this program has two objectives: "1. Maximize the price the potato producer receives for his annual crop. 2. Minimize the cost of gathering the market data that allows the producer to maximize price." UPGC reported that prices received for potatoes in the past two marketing years were positively affected by the market intelligence supplied by UPGC's data.

156. UPGA's and UPGI's 2007-08 United Acreage Reduction Program established the following rules similar to those of the earlier years: Each base potato acre was assessed at $50. A base year relative to which the acreage reduction was calculated was 2004. Members and *non-members* willing to participate in the program had two options. The first option was to reduce potato-planting area by exactly 15% relative to the 2004 year base. This option was considered to be a payment in kind and the grower would owe no cash. The second option was to reduce potato acreage by less than 15% relative to the 2004-year base. In this case, the grower was assessed a pro-rated percentage of $50 per acre on all base acres.

157. There were four levels of the pro-rated percentage. For example, if a grower's acreage reduction was between 10% and 14.99%, then the grower paid $20 per base acre; if the acreage reduction was between 5% and 9.99%, then the grower paid $30 per base acre. The collected money was used to "buy out" acres elsewhere. Growers who decided to expand beyond their base were assessed $100 per acre on all acres (expansion plus base acres). This fee was a punitive measure to prevent the "mindless expansion" that UPGI and UPGA considered to be illegitimate and against the mission of supply reduction.

158. Those SIPCO members of UPGI who grew only processing potatoes were allowed to plant only contracted processing potato acres. The UPGI/SIPCO members who grew

both fresh and processing potatoes were required to follow the potato planting guidelines for their fresh potato acres and were allowed to plant only contracted processing potato acres.

159. In 2008, growers following UPGA's plans planted on 80,000 fewer acres than in 2007. In Idaho alone, growers reduced acreage from 350,000 to 300,000.

160. A May 2008 study by a professor of Agricultural Economics and Rural Sociology at the University of Idaho, entitled, "Does the Potato Supply Management Program Work? A case of the Idaho Potato Industry," concluded that UPGI's and UPGA's efforts had resulted in increased prices. Idaho monthly fresh potato prices increased from $3.89 per cwt in the pre-coop period to $6.63 per cwt in the coop period, while the United States monthly fresh potato prices increased from $7.78 per cwt to $10.19 per cwt. In fact, approximately 60% of the price increases were due to reasons other than increased production facts and the cooperatives' price-fixing activities were "likely to be the most significant factor explaining the identified price increases."

161. The study reported that "[a]s indicated by the US monthly fresh potato prices, all potato growers received higher prices since 2005, after the acreage management programs started being implemented in several potato growing regions in the country." The study concluded that, "we believe that the [UPGI] and potato growers cooperatives with similar objectives were successful in accomplishing their goals and impacted the fresh potato price level and volatility during the period 2005-2008, which ultimately benefitted all potato growers."

162. PotatoPro, a web portal run by Food Innovation Online Corp., providing potato news, services and products for the global potato processing industry, reported on the measures taken by PEIPB to improve returns of tablestock growers and all potato growers in the province, including supporting acreage reductions through UPGA and UPGC. In September 2008,

PotatoPro reported that since 2004, potato acreage in Canada had decreased by 45,900 acres or 10.6% and fall potato acreage in the United States had decreased by 110,600 acres or 10.6%.

163. PotatoPro continued that through the organizations in both countries, information is shared on supply and demand, current market conditions and pricing. The PEIPB then disseminates that information out to Prince Edward Island potato farmers as well as to the potato dealers and exporters who market the crop in North America and around the world. This is done through participation in weekly marketing conference calls with growers in the United States and Canada, information shared among United member organizations, PEIPB providing growers and dealers with a free weekly industry newsletter, as well as giving regular market updates to Prince Edward Island growers and dealers. On these calls, information is provided from other areas of Canada and the United States.

164. By 2009, potato prices had remained constant or increased for four consecutive growing seasons – something that had never happened in more than a century that the USDA has been keeping such records.

165. UPGA's 2009 Annual Report included a graph reflecting U.S. Fresh Shipments vs. U.S. Grower Return Index: 2002- 2009. The Report concluded that "[o]nce UPGA formed it implemented supply management programs, and the effect can be seen in the drop in total U.S. Fresh Shipments (the bars in the graph) and a corresponding increase in the GRI."

166. Defendants' anticompetitive scheme has continued to the present. For example, a May 2010 UPGA newsletter describes how 400 fresh and processed potato growers in the United States attended 16 United Potato Partners seminars this year at which they "consider[ed] the latest about cost of production specific to their area, ponder[ed] current demand data and review[ed] United's published acreage guidelines before beginning spring planting." The

seminars were designed to facilitate "informal discussions." Buzz Shahan, UPGA's Chief Operating Officer, stated, "[t]hese seminars are one of the most important methods we have for communicating United's published acreage planting guidelines to member and non-member growers in a face-to-face setting." A representative of Defendant Bayer CropScience attended each of the seminars.

167. Similarly, on its website, UPGI has a page devoted to its 2010 Planting Guidelines, which were issued in September of 2009. UPGI stated that the potato crop may be larger than usual this year. UPGI then strategized that, "**[w]ith this potential in mind, United of Idaho's Supply Committee is in agreement with ALL of the United of America Directors in recommending the follow [sic] planting guidelines for next year. All growers are asked to plant 70-75% of their 2004 base in 2010 to BALANCE next year's crop with this year's anticipated large carry over.** This recommendation to cut 25–30% off your 2004 base acres will be finalized in November when we have the final tally on this year's yields and production nationwide. This same 70-75% planting guideline is extended to all fry contract growers." (Emphasis added.)

168. As described above, Defendants followed acreage reductions requirements, participated in the bid-buy-down program, participated in and utilized information obtained from marketing calls and packing reports and engaged in other efforts to reduce the supply of potatoes. The acts were undertaken with the purpose and effect of fixing, raising, maintaining and stabilizing potato prices.

## INJURY TO PLAINTIFFS AND THE CLASS

169. Defendants' conduct has had the following effects:

a. the supply of potatoes and quantity of potatoes available for purchase has been reduced in each and every state in the continental United States and the District of Columbia;

b. the price of potatoes has been raised, fixed, maintained, or stabilized at supra-competitive levels in each and every state in the continental United States and the District of Columbia; and

c. indirect purchasers of potatoes have been deprived of free and open competition for the sale of potatoes in each and every state in the continental United States and District of Columbia.

170. As a result of the contract, combination or conspiracy, Plaintiffs and Class Members have sustained injury because they have paid more for potatoes and potato products than they would have in the absence of the conspiracy.

**COUNT ONE**

(Section 1 of the Sherman Act)

(For Injunctive Relief Only)

171. Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs as if fully set forth herein.

172. Beginning at least as early as 2004 and continuing until present, the exact dates being currently unknown to Plaintiffs, Defendants entered into and engaged in a contract, combination or conspiracy in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act.

173. Plaintiffs and the Class have no adequate remedy at law and will suffer irreparable harm unless Defendants are enjoined from continuing to implement their unlawful agreement in the future, and the Court remedies the conditions Defendants created in the potato industry in furtherance of their conspiracy. Otherwise, Plaintiffs and the Class will continue pay more for potatoes and potato products than they would have in the absence of the conspiracy.

**COUNT TWO**

(Violations of State Statutes)

174. Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs as if fully set forth herein.

175. Defendants' conduct was malicious, flagrant and intended to harm Plaintiffs and the Class or undertaken with a reckless disregard for their rights under the antitrust and consumer protection laws violated below.

176. Defendants have violated:

a. Arizona (Uniform State Antitrust Act, Ariz. Rev. Stat. Ann. § 44-1402);

b. Arizona (Consumer Protection Act, Ariz. Rev. Stat. Ann. § 44-1522);

c. Arkansas (Deceptive Trade Practices Act, Ark. Code Ann. § 4-88-107(a));

d. Arkansas (Deceptive Trade Practices Act, Ark. Code Ann. § 4-88-108);

e. California (Cartwright Act, Cal. Bus. & Prof. Code §§ 16722 & 16726);

f. District of Columbia (Antitrust Act, D.C. Code Ann. § 28-4502);

g. District of Columbia (Consumer Protection and Procedures Act, D.C. Code Ann.§ 28-3904);

h. Florida (Deceptive & Unlawful Trade Practices Act, Fla. Stat. § 501.204);

i. Iowa (Competition Law, § 553.4);

j. Kansas (Restraint of Trade Act, Kan. Stat. Ann. § 50-112);

k. Kansas (Unfair Trade and Consumer Protection Act, Kan. Stat. Ann. § 50-626);

l. Michigan (Antitrust Reform Act, Section 2, Mich. Comp. Laws Ann. § 445.772);

m. Minnesota (Antitrust Law, Minn. Stat. § 325D.51);

n. Mississippi (Miss. Code Ann. § 75-21-1);

o. Montana (Unfair Trade Practices and Consumer Protection Act, Mont. Code Ann. § 30-14-205);

p. Montana (Unfair Trade Practices and Consumer Protection Act, Mont. Code Ann. § 30-14-103);

q. Nebraska (Junkin Act, Neb. Rev. Stat. § 59-801);

r. Nebraska (Consumer Protection Act, Neb. Rev. Stat. § 59-1602 & 1603);

s. Nevada (Unfair Trade Practices Act, Nev. Rev. Stat. § 598A.06);

t. New Hampshire (N.H. Rev. Stat. Ann. § 356:2);

u. New Hampshire (N.H. Rev. Stat. Ann. § 358-A:2);

v. New Mexico (Antitrust Reform Act, N.M. Stat. Ann. § 57-1-1);

w. New Mexico (Unfair Trade Practices Act, N.M. Stat. Ann. § 57-12-3);

x. New York (Donnelly Act, N.Y. Gen. Bus. Law § 340(1));

y. North Carolina (N.C. Gen. Stat. § 75-1);

z. North Carolina (Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1);

aa. North Dakota (Uniform State Antitrust Act, N.D. Cent. Code, § 51.08.1-02);

bb. North Dakota (N.D. Cent. Code § 51-15-02);

cc. South Dakota (Antitrust Law, S.D. Codified Laws Ann. § 37-1-3.1);

dd. South Dakota (Unfair Practices and Consumer Protection Law, S.D. Codified Laws Ann. § 37-24-6);

ee. Tennessee (Trade Practices Act, Tenn. Code Ann. § 47-25-102);

ff. Utah (Consumer Protection Sales Practices Act, Utah Code Ann. § 13-11-4);

gg. Utah (Consumer Protection Sales Practices Act, Utah Code Ann. § 13-11-5);

hh. Vermont (Vermont Consumer Fraud Act, 9 Vt. Stat. Ann. § 2453);

ii. West Virginia (Antitrust Act, W.Va. Code § 47-18-3); and

jj. Wyoming (Wyo. Stat. Ann. § 40-4-1).

177. By reason of Defendants' conspiracy in restraint of trade and unfair and deceptive trade practices, Plaintiffs and each member of the Class paid more for potatoes and products containing potatoes than they would have paid in the absence of such conduct. As a result, Plaintiffs and each member of the Class have been injured and damaged in an amount presently undetermined.

## COUNT THREE

(UNJUST ENRICHMENT)

178. Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

179. Through paying more for potatoes than they would have in the absence of Defendants' wrongful conduct, Plaintiffs and the Class have conferred a benefit on Defendants.

180. As a result of Defendants' wrongful conduct, Defendants were able to charge more for potatoes which overpayments were made by Plaintiffs and the Class.

181. Defendants have been unjustly enriched by overpayments made by Plaintiffs and the Class. Equity demands that Defendants be required to make restitution and return the overpayments to Plaintiffs and the Class.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that the Court enter judgment as follows:

a. Determining that this action may be maintained as a class action pursuant to Rules 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure;

b. Enjoining Defendants from continuing to implement their unlawful agreement and ordering Defendants to take such actions as necessary to remediate the market conditions that Defendants created which would allow them to maintain, or continue to increase, prices above competitive levels;

c. Awarding Plaintiffs and the relevant Class Members compensatory damages under the state statutes in an amount to be proven at trial, multiple damages according to law against Defendants, jointly and severally;

d. Awarding Plaintiffs and the relevant Class Members punitive, exemplary, statutory, and full consideration damages under the aforementioned state laws;

e. Ordering Defendants to disgorge their profits earned as a result of their wrongful conduct and ordering them to make restitution to Plaintiffs and the Class;

f. Awarding Plaintiffs and the Class pre-judgment and post-judgment interest;

g. Awarding Plaintiffs and the Class their costs of suit, including reasonable attorneys' fees; and

h. Granting Plaintiffs and the Class such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiffs hereby demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable in this case.

Dated: October 13, 2010

By: [signature]

Chad V. Bonanni
Bergeron, Paradis & Fitzpatrick
34 Pearl Street, P.O. Box 174
Essex Junction, VT 05453
Tel. 802.879.6304
cbonanni@essex.bpflegal.com

Paul F. Novak
Milberg LLP
One Kennedy Square
777 Woodward Ave, Suite 890
Detroit, MI 48226
Tel. 313.309.1760
pnovak@milberg.com

Peter Safirstein
Milberg LLP
One Pennsylvania Plaza, 49th Floor
New York, NY 10119
Tel. 212.594.5300
psafirstein@milberg.com

Matthew S. Wild
Wild Law Group PLLC
500 Mamaroneck Avenue, Suite 320
Harrison, NY 10528
Tel. 914.358.6443
mwild@wildlawgroup.com

Guri Ademi
Shpetim Ademi
David J. Syrios
Ademi & O'Reilly, LLP
3620 E. Layton Avenue
Cudahy, WI 53110
Tel. (414) 482-8000
gademi@ademilaw.com
sademi@ademilaw.com
dsyrios@ademilaw.com

Counsel for Plaintiffs and the Proposed Class