UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| IN RE: FRESH AND PROCESS POTATOES ANTITRUST LITIGATION | Case No. 4:10-MD-2186-BLW **MEMORANDUM DECISION AND ORDER** |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

## INTRODUCTION

The Court has before it several pending motions (Dkts. 72, 73, 75, 76, 77, 78, 79, 82, 85, 88, 120 and 122).  The Court heard oral argument on the motions on June 20, 2011,[1] and now issues the following memorandum decision and order.

## BACKGROUND

Plaintiffs are a company who claims to have purchased potatoes directly from one or more of the defendants, and a series of persons or entities who allege they have indirectly purchased potatoes from one or more of the defendants.  The former is referred

---

[1] The Court apologizes to counsel and the parties for the delay in issuing this decision.  The confluence of a number of unanticipated events led to the "perfect storm" which precluded me from meeting my aspirational goal of issuing a decision on all motions within 30-45 days after oral argument. The Court will do everything within its power to ensure that this type of delay does not occur in the future.

to as direct purchaser plaintiffs and the latter as indirect purchaser plaintiffs.[2]  All plaintiffs contend that defendants illegally agreed to reduce the supply of potatoes in order to raise prices.  Plaintiffs assert that the alleged scheme started when potato growers in Idaho formed a cooperative called United Potato Growers of Idaho ("UPGI").  The Idaho potato growers, along with potato farmers in several other states, then established United Potato Growers of America ("UPGA") as an umbrella cooperative.

Plaintiffs assert that the cooperatives were created for the purpose of increasing the price of potatoes through supply management.  They further allege that defendants implemented their plan by agreeing to limit potato planting acreages, and by paying farmers to either destroy existing stocks or refrain from growing additional potatoes in order to reduce the overall number of potatoes available for sale to direct purchasers.  Plaintiffs contend that defendants' supply reduction program caused potato prices to be fixed, raised, maintained, and/or stabilized.  This, it is argued, violated the antitrust laws.

Defendants filed motions to dismiss on several grounds.  Some of their arguments apply to all defendants (or large groups of defendants), while some are specific to individual defendants.  After laying out the general legal standard for motions to dismiss, the Court will address motions that apply to each large groups of defendants, and then

---

[2] In this decision, the Court will distinguish between direct and indirect purchaser plaintiffs when necessary.  Otherwise, the Court will refer to both direct and indirect purchaser plaintiffs simply as Plaintiffs.

address individual defendant motions.[3]

## LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires only "'a short and plain statement of the claim showing that the pleader is entitled to relief,'" in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests, . . ." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). While a complaint attacked by a Rule 12(b)(6) motion to dismiss "does not need detailed factual allegations," it must set forth "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Id*. at 570. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id*. at 556. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Id*. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id*. at 557.

In a more recent case, the Supreme Court identified two "working principles" that underlie *Twombly*. *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). First, the tenet

---

[3] Based on discussions between the Court and counsel during oral argument, the Court will not rule on jurisdictional issues at this time. It appears this Court will permanently preside over the matter by stipulation and/or concession.

that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. *Id*. "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Id.* at 1950. Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. *Id.* "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

A dismissal without leave to amend is improper unless it is beyond doubt that the complaint "could not be saved by any amendment." *Harris v. Amgen, Inc.*, 573 F.3d 728, 737 (9th Cir. 2009) (issued two months after *Iqbal*).[4] The Ninth Circuit has held that "in dismissals for failure to state a claim, a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv., Inc.,* 911 F.2d 242, 247 (9th Cir. 1990). The issue is not whether plaintiff will prevail but whether he "is entitled to offer evidence to support the claims."

---

[4] The Court has some concern about the continued vitality of the liberal amendment policy adopted in *Harris v. Amgen*, based as it is on language in *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), suggesting that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim . . . ." Given *Twombly* and *Iqbal*'s rejection of the liberal pleading standards adopted by *Conley,* a question arises whether the liberal amendment policy of *Harris v Amgen* still exists. Nevertheless, the Circuit has continued to apply the liberal amendment policy even after dismissing claims for violating *Iqbal* and *Twombly. See Market Trading, Inc. v. AT&T Mobility, LLC*, 2010 WL 2836092 (9th Cir. July 20, 2010) (not for publication). Accordingly, the Court will follow suit.

*See Hydrick v. Hunter*, 466 F.3d 676, 685 (9th Cir. 2006).

These familiar principles guide the Court's analysis of any 12(b)(6) motion, but they bear repeating here. The Court will consider the Supreme Court's landmark decision, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007), in more detail later, along with Ninth Circuit authority interpreting that decision. *Twombly* is of particular importance here – not only because it announced the plausibility standard in the first place, but because it did so in the context of a Sherman Act § 1 claim.

## ANALYSIS

Plaintiffs allege that defendants violated § 1 of the Sherman Act, which prohibits "any contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1. To state a claim under § 1, plaintiffs must plead facts that plausibly suggest "(1) an agreement or conspiracy among two or more persons or distinct business entities, (2) by which the persons or entities intend to harm or restrain competition, and (3) which actually injures competition." *Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n*, 884 F.2d 504, 507 (9th Cir. 1989). Additionally, for each individual defendant, plaintiffs must allege that *that* defendant had "'a conscious commitment to a common scheme designed to achieve an unlawful object.'" *Monsanto Co. v. Spray-Rite Corp.*, 465 U.S. 752, 764 (1984) (citation omitted).

Defendants' motions to dismiss fall into four basic categories. First, a large group of defendants assert that the Capper-Volstead Act immunizes them from Sherman Act liability. Second, these defendants, along with several others, argue that plaintiffs have

failed to plausibly allege that each individual defendant joined the conspiracy. Third, several defendants argue that the indirect-purchaser plaintiffs' claims should be dismissed based on standing and preemption doctrines. Fourth, defendant United Potato Growers of Canada ("UPGC") asserts unique arguments for dismissal based upon, among other things, the act of state doctrine.

## 1. MOTIONS TO DISMISS BASED ON THE CAPPER-VOLSTEAD ACT

### A. The Capper-Volstead Act and Related Statutes

Congress enacted the Capper-Volstead Act in the early 1900's. It provides agricultural cooperatives with a limited exemption from antitrust laws. It states that:

> Persons engaged in the production of agricultural products as farmers, planters, ranchmen, dairymen, nut or fruit growers may act together in associations, corporate or otherwise, with or without capital stock, in collectively processing, preparing for market, handling, and marketing in interstate and foreign commerce, such products of persons so engaged. Such associations may have marketing agencies in common; and such associations and their members may make the necessary contracts and agreements to effect such purposes: *Provided, however*, That such associations are operated for the mutual benefit of the members thereof . . . .

7 U.S.C. § 291. The Capper-Volstead Act clarified and expanded the antitrust exemption for cooperatives found in Section 6 of the Clayton Act, which provided that:

> Nothing contained in the antitrust laws shall be construed to forbid the existence and operation of labor, agricultural or horticultural organizations instituted for the purposes of mutual help . . . or forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objects thereof; nor shall such organizations, or the members thereof, be held or construed to be illegal combinations or

conspiracies in restraint of trade under the antitrust laws.

15 U.S.C. § 17.

Congress had enacted Section 6 of the Clayton Act to counter the possibility that the Sherman Act's prohibition against combinations in restraint of trade would be applied to imperil the development of cooperative endeavors such as unions. *Case-Swayne Co. v. Sunkist Growers, Inc.*, 389 U.S. 384, 390-91 (1967). But Section 6 of the Clayton Act "shows no more than a purpose to allow farmers to act together in cooperative associations without the associations as such being held or construed to be illegal combinations or conspiracies in restraint of trade, under the antitrust laws, as they otherwise might have been." *Maryland & Virginia Milk Producers Ass'n v. U.S.*, 362 U.S. 458, 465 (1960) (Internal quotations omitted). Thus, "a group of farmers acting together as a single entity in an association cannot be restrained from lawfully carrying out the legitimate objects thereof, but . . . it [does not] give[] such an entity full freedom to engage in predatory trade practices at will." *Id.* (Internal quotations omitted).

With respect to the Capper-Volstead Act, the Supreme Court has recognized that it and its legislative history "'indicate[ ] a purpose to make it possible for farmer-producers to organize together, set association policy, fix prices at which their cooperative will sell their produce, and otherwise carry on like a business corporation without thereby violating the antitrust laws.'" *In re Mushroom Direct Purchaser Antitrust Litigation*, 621 F. Supp. 2d 274, 283 (E.D. Pa., 2009) (citing *Maryland & Virginia Milk Producers*, 362 U.S. 458, 466 (1960). It provides "that among the legitimate objects of farmer

organizations [are] collectively processing, preparing for market, handling, and marketing products through common marketing agencies and the making of necessary contracts and agreements to effect such purposes." *Id*. (Internal quotations omitted). Thus, the general philosophy of Section 6 of the Clayton Act and the Capper-Volstead Act is simply that, through agricultural cooperatives acting as entities, individual farmers should be given the same unified competitive advantage and responsibility available to businessmen acting through corporations as entities. *Id*.

As explained below, the Court will deny the motions to dismiss to the extent they are based on the Capper-Volstead Act because questions of fact remain as to whether the Act applies in this case. However, the Court recognizes that the parties fully briefed and argued areas of law where case law is scant, and where there are no disputed issues of fact in this case. Under these circumstances, the Court believes it prudent to address these areas of law because leaving them unresolved would likely cause the parties to incur unnecessary expense going forward.[5] If, as the case progresses, disputed issues of fact appear where there were none today, or if significant new decisions are issued, a motion for reconsideration may be appropriate.

---

[5] This is an extraordinary step. Normally, the Court would not address an issue which was not legally or factually necessary to its decision. However, the Court views that offering such an "advisory opinion" in this case as consistent with the command of Rule 1, that the Federal Rules of Civil Procedure be "construed and administered to secure the just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1.

### (1). *Questions of Fact Remain about Whether the Capper-Volstead Act Applies*

As noted above, the Capper-Volstead Act exempts certain agricultural cooperatives from antitrust liability. However, the Supreme Court has made clear that the exemption only applies if all participants in the organization qualify under the Act. Questions of fact prevent the Court from making a final determination on this question at this time.

In their complaint,[6] Plaintiffs contend that the Capper-Volstead exemption does not apply because Defendants conspired with non-members, ineligible members, and non-producers. Plaintiff's contention is based upon the Supreme Court's decisions in *Case-Swayne Co. v. Sunkist Growers, Inc.*, 389 U.S. 384 (1967) and *National Broiler Marketing Ass'n v. United States*, 436 U.S. 816 (1978).

In *Sunkist*, the Court concluded that Congress did not intend to allow organizations with nonproducer interests to avail themselves of the Capper-Volstead exemption. *Sunkist*, 389 U.S. at 395-96. In that case, the structure of the Sunkist system included local producers organized into associations operating packing houses, with those houses organized into exchanges. *Id*. at 386. Although eighty-five percent of the local associations were exclusively made up of fruit growers, the remaining members were private, for-profit packing houses. *Id*.

---

[6] In this decision, the Court will refer to the direct purchaser complaint as DPC, and the indirect purchaser complaint as IPC when necessary to distinguish the two. Otherwise, the Court will simply refer to the complaint.

The packers entered into contracts with producers where they would handle each grower's fruit at cost, plus a fixed surcharge. *Id.* The Supreme Court explained that the exemption should be limited to only actual producers of agricultural products, and not those involved in the processing of those raw commodities into other products. *Id.* at 393. The Supreme Court concluded that Sunkist could not avail itself of the Capper-Volstead exemption because it included nonproducer interests. *Id.* The court noted that the right of agricultural producers to unite under the Capper-Volstead Act "cannot be deemed to authorize any combination or conspiracy with other persons in restraint of trade that these producers may see fit to devise." *Id.* at 395 (Internal citation omitted).

The holding in *Sunkist* was reaffirmed in *National Broiler Marketing Ass'n v. United States*, 436 U.S. 816 (1978). There, the Supreme Court concluded that in order for a defendant to be exempt from antitrust liability pursuant to Capper-Volstead, the defendant must establish that both itself, and all entities with which it conspired, qualify under the Act. *National Broiler*, 436 U.S. at 822-23. "It is not enough that a typical member qualify, or even that most of [the] members qualify." *Id.*

Plaintiffs' complaint alleges that the cooperatives involve numerous vertically integrated members who perform packing and processing functions for themselves and other growers of potatoes. The majority opinions in *Sunkist* and *National Broiler* do not provide a clear indication whether such integrated agribusiness would be a disqualified participant in an association otherwise protected by Capper-Volstead. Indeed, the majority in *National Broiler* expressly chose not to address the question. However, the

dissenting and concurring opinions in that decision provide something of a roadmap to the answer to that question.

The dissent in *National Broiler* suggested that expanding the exemption to include integrated agribusiness is necessary because the nature of agriculture has changed dramatically since the Capper-Volstead Act was adopted. *Id*. Justice Brennan's concurring opinion explained why that argument fails. Justice Brennan noted that the dissent "recognizes that integrated . . . producers do not neatly fit the limitation Congress signified by the phrase 'as farmers,' but reads that limitation out of the Act in order to give effect to what it perceives as Congress' desire to aid the agricultural industry generally because of the uncertainty of profits in that industry caused by the combination of weather, fluctuations in demand, and perishability of the product." *National Broiler*, 436 U.S. at 834 (Brennan, J., concurring). He then explained that such a drastic restructuring of the statute is both inconsistent with Congress' specific intent regarding the meaning of the limitation, and unnecessary to give continuing effect to its broader purposes. *Id*. In Justice Brennan's view, Congress consciously chose not to exempt processors engaged in the production of agriculture even though they bore some risks in common with agriculture generally. *Id*. The dissent's approach of adopting a bright-line rule permitting integrated producers to partake of the benefits of Capper-Volstead would do violence to that legislative intent. In Justice Brennan's view the proper approach is to engage in a case-by-case analysis, in which, "the nature of the association's activities, the degree of integration of its members, and the functions historically performed by farmers

in the industry are relevant considerations in deciding whether an association is exempt." *Id*. at 836.[7]

The defendants here urge the Court to adopt the bright line rule suggested by the dissent in *National Broiler*, to the effect that a farming operation is an eligible participant under Capper-Volstead, even if it is a fully integrated operation which extends from spring planting to the grocery store warehouse. However, the Court agrees with Justice Brennan's concern with that view. Adopting the dissent's expansive reading of the statute would read "the farmer" requirement out of the statute, ignore congressional intent, and create the potential for abuse.

On the other hand, the Court is also disinclined to adopt a bright line rule that any degree of vertical integration disqualifies a farming operation from participating in a Capper-Volstead eligible association. Rather, a factually-intense inquiry is necessary – one which focuses on the economics and history of potato marketing, the actual functions of the associations, and the degree of integration of the participants. From that evaluation a determination must be made as to whether granting Capper-Volstead exemption here would be consistent with the legislative intent to create an environment in which farmers can compete on a level playing field. However, a better-developed record is necessary

---

[7] Relying on Justice Brennan's concurrence, at least one lower Court has denied application of the Capper-Volstead exemption to integrated producers. In *United States v. Hinote*, 823 F. Supp. 1350 (S.D. Miss 1993) the district court reasoned that applying Capper-Volstead to integrated producers would allow large agribusinesses organized to market and sell agricultural products to exempt themselves from the antitrust laws by simply purchasing or leasing some interest in a farming operation, no matter how de minimis the interest. *Id*. at 1359. The court concluded that such a result would undermine Congress' express purpose in enacting the Capper-Volstead Act. *Id*.

before the Court can make that determination.

Accordingly, the Court will deny the motions to dismiss to the extent they are based on Capper-Volstead. In their complaint, Plaintiffs allege that Defendants entered into agreements with unprotected entities, including non-protected potato groups, non-producer partners, a dehydration joint venture, and integrated members and packer/warehouses. If proved, these allegations could preclude application of the Capper-Volstead exemption. Resolving these allegations of alleged anti-competitive practices which potentially place a defendant's conduct outside the Capper-Volstead exemption requires a fact intensive inquiry which should be completed by the Court only after proper discovery has been conducted.[8]

(2).  *Legal Issues*

As noted above, the Court will, although not necessary to its decision, address legal issues which have been fully briefed and argued, on which there is little case law, and where there are no disputed issues of fact.

(a)  *Collusive Production Curtailment*

Plaintiffs contend that the list of activities protected by the Capper-Volstead Act

---

[8] As an additional ground for denying the motion to dismiss, the Court notes that the Capper-Volstead exemption is an affirmative defense. *Alexander v. National Farmers Organization*, 687 F.2d 1173, 1184 (8th Cir. 1982)(the Capper Volstead exemption "is an affirmative defense. . . ."). *See also Fairdale Farms, Inc. v. Yankee Milk, Inc.*, 635 F.2d 1037, 1039 (2nd Cir. 1980) (referring to Capper-Volstead exemption as an affirmative defense); *Northern California Supermarkets, Inc. v. Central California*, 413 F. Supp. 984, 987 (D.C. Cal. 1976) (referencing the Capper-Volstead as an affirmative defense). In general, the merits of an affirmative defense cannot be properly addressed through Rule 12(b)(6), but should be resolved at trial or on summary judgment. *See In re Southeastern Milk Antitrust Litigation,* 2008 WL 2368212 (E.D. Tenn. 2008).

excludes acreage reductions, production restrictions, or collusive crop planning. The Court agrees.

The Court first notes that there are no cases where a court specifically approved, under the Capper-Volstead Act, a pre-production agricultural output limitation as opposed to a post-production marketing decision such as withholding of product from market. Likewise, there are no cases where a court has concluded that Capper-Volstead immunizes cooperatives and their members who seek to collectively implement production controls in order to raise prices.

However, the language of the Capper-Volstead Act itself indicates that it does not apply to production limitations. The Court must construe statutory terms in accordance with their ordinary meaning. *Federal Deposit Ins. Corp. v. Meyer*, 510 U.S. 471, 476 (1994); *United States v. Nader*, 542 F.3d 713, 717 (9th Cir. 2008). The key phrase of the Act, "processing, preparing for market, handling, and marketing," applies to acts done to an agricultural product after it has been planted and harvested. Thus, under the plain language of the statute, coordinating and reducing acreage for planting is not allowed.[9]

---

[9] Federal agencies have also recognized that production limitations are not permitted under Capper-Volstead. To the degree there is ambiguity in the statute on this issue, agencies with jurisdiction over the statue are typically entitled to *Chevron* deference, and their decisions would be persuasive. *National Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005). The DOJ and the FTC, the prime agencies responsible for enforcing federal antitrust laws, suggest a narrow interpretation of Capper-Volstead. The FTC's position seems clear from its statements in *California Lettuce* as explained below. As for the DOJ, it has expressed its position in its report to the task group on antitrust immunities. The DOJ explained that there is "evidence that Congress was concerned about the right or ability of cooperatives to restrict the supply of agricultural commodities." *A Report of the U.S. Department of Justice to the Task Group on Antitrust Immunities*, p. 68 (1977), Dkt. 111-14, Ex. M. The DOJ went on to state that "[i]t is not surprising that Congress did not specifically grant to the cooperatives the power to restrict supply . . . ." *Id.* The DOJ concluded that "it would not be the act of a rational

The cases cited by Defendants for the contrary view are distinguishable. For example, in *In the Matter of Wash. Crab Ass'n*, 66 F.T.C. 45 (1964), the court did not address Capper-Volstead. Instead, the case dealt with the Fishermen's Collective Marketing Act ("FCMA") (15 U.S.C. § 521), which states:

> Persons engaged in the fishery industry, as fishermen, catching, collecting, or cultivating aquatic products, or as planters of aquatic products on public or private beds, may act together in associations, corporate or otherwise, with or without capital stock, in collectively catching, producing, preparing for market, processing, handling, and marketing in interstate and foreign commerce, such products of said persons so engaged.

15 U.S.C. § 521. The plain language of that statute is far different from the plain language of Capper-Volstead. It specifically allows fishermen to act jointly in producing and catching fish.

Defendants next suggest that the court in *Alexander v. Nat'l Farmers Organization*, 687 F.2d 1173 (8th Cir. 1982) broadly considered antitrust claims involving a cooperative's efforts to limit the supply of milk. Defendants cite the court's conclusion that the cooperative's decision to withhold milk from the market "as a general matter, is within the scope of the Capper-Volstead exemption." *Alexander*, 687 F.2d at

---

legislature to give the cooperatives the power to deal with overproduction, a factor which had been demonstrated was not a cause of the crisis it was addressing." *Id.* at 68-69.

The USDA's position has also been consistent with that of DOJ and FTC and in opposition to a view that production curtailments are allowed under Capper-Volstead. The USDA has issued reports and guidelines to farmers indicating that "it is not legal for cooperatives to control members' production. The basic role of cooperatives is to market the available supply in the most effective manner possible, not to limit production." *Farmer Cooperatives in the United States, Cooperative Information Report 1 Section 3, USDA, Rural Business – Cooperative Service*, p. 17 (1980, reprinted 1990), Dkt. 111-16, Ex. O.

1188.  *Alexander* did not involve a production restriction, however.  Instead, members of a dairy farmer cooperative withheld already produced milk from the market for a matter of days until the DOJ successfully enjoined it.  *Alexander*, 687 F.2d at 1182.

The case of *Holly Sugar Corp. v. Goshen County Co-op. Beet Growers Ass'n*, 725 F.2d 564 (10th Cir. 1984) is even less applicable to this case.  Defendants properly explain that in that case the Tenth Circuit recognized that the Capper-Volstead exemption protected the efforts of a sugar beet growers' association to prevent its members from contracting outside of the association.  Members of the association had signed a marketing agreement which prevented them from contracting individually with a buyer. *Holly Sugar*, 725 F.2d at 566.  After the association failed to reach an agreement with the buyer, several growers sought to sell their sugar beets outside of the association.  *Id*.  The members sued the association for relief from the marketing restriction, and the trial court granted the injunction.  *Id*. at 567.  The Tenth Circuit reversed and held that the marketing agreement did not violate antitrust laws and that the cooperative could prevent its members from negotiating independent sales contracts.  *Id*. at 569.

Based on that finding, Defendants suggest that the Tenth Circuit concluded that the cooperative could manage the supply of sugar beets by preventing its members from putting their crops on the market.  Notably, however, there was no finding that the cooperative controlled pre-production agricultural output.

Defendants next rely on *Northern California Supermarkets, Inc. v. Central California Lettuce Producers Coop., et al.*, 413 F. Supp. 984 (N.D. Cal 1976) which

concluded that a cooperative's activities were within the purposes of Capper-Volstead and Section 6 of the Clayton Act through all production phases. In that case, the court specifically noted that the cooperative engaged in marketing activities such as gathering and disseminating information concerning the planting, harvesting and shipment of lettuce. This general statement does seem to cloud the issue a bit. However, there was no dispute in *Northern California Supermarkets* that the "primary activity of [the cooperative] [was] to set prices or price ranges to which members [were] required to adhere in the sale of their lettuce." *Id.* at 987. There was no indication that the cooperative actually curtailed production or did anything more than gather and disseminate information regarding pre-production agricultural output.

Still, Defendants argue that because Capper-Volstead cooperatives are allowed to fix prices, they must also be allowed to restrict production. This argument is unpersuasive. The reason an agricultural cooperative can fix the price at which their good is sold is because if the price rises, farmers will produce more and consumers will not be overcharged. Individual freedom to produce more in times of high prices is a quintessential safeguard against Capper-Volstead abuse, which Congress recognized in enacting the statute.

Although dicta, the FTC's language in *In the Matter of Central California Lettuce Producers Cooperative,* 90 F.T.C. 18, at 32 n. 20 (July 25, 1977) is telling on this matter:

> Congress' attitude toward production controls provides an
> additional indication that it did not regard the corporation as
> the model around which the Capper-Volstead exemption

would be built. Beyond doubt, a single corporation can
restrict its output, if it chooses, without incurring antitrust
liability. Nevertheless, *there are strong indications that
Congress did not intend to allow farmers to use cooperatives
as a vehicle by which they could effectively agree to limit
production.*

(*emphasis added*).  The FTC went on to quote Senator Capper during debate of the Act,

where he stated:

> But a farmers' monopoly is impossible. If the cooperative
> marketing association makes its price too high, the result is
> inevitable self-destruction by overproduction in the following
> years. No other industry except agriculture has this automatic
> safeguard. With corporation activities the group producers,
> such as the United States Steel Corporation, can reduce the
> quantity of steel rails it will produce at any given time or
> completely close down its mills and reduce the supply.

*Id*. (Internal citations omitted).

Furthermore, "Congress has reinforced the interpretation that production controls

were not authorized by adding to the Capper-Volstead Act a comprehensive statutory

scheme for controlling supply in the form of the Agricultural Marketing Agreement Act

of 1937 (AMAA), 7 U.S.C. 601 et seq." *Id*.  If a cooperative is allowed to limit

production among its own members, it can "shut[] off the safety valve against private

abuse that ameliorates the adverse consumer impact of the Capper-Volstead exemption

and circumvent[] the important procedural safeguards of the AMAA." *Id*.

For these reasons, the Court concludes that acreage reductions, production

restrictions, and collusive crop planning are not activities protected by the Capper-

Volstead Act.

**(b)** *Alleged Conspiracy with Foreign Association*

Plaintiffs do not challenge the applicability of the Capper-Volstead exemption based on foreign farmers being members of UPGA. However, they do contend that any conspiracy with a foreign association negates the exemption. The issue has not been directly addressed by a court, and opinions on the matter are scant at best.

The most compelling evidence of whether a domestic cooperative forfeits application of the Capper-Volstead applies when it conspires with a foreign association is in the Act itself. The Capper-Volstead Act uses the term "persons" without limitation and does not exclude foreign producers. As pointed out by Defendants, the reference in the Act to "foreign commerce" demonstrates that Congress intended Capper-Volstead to apply to foreign entities. 7 U.S.C. §§ 291-292. Additionally, Section 6 of the Clayton Act serves to exempt agricultural producers from liability under the antitrust laws. The Sherman Act and the Clayton Act both define "person" to include "corporations and associations existing under or authorized by the laws of the United States, the laws of any of the Territories, the laws of any State, or the laws of any foreign country." 15 U.S.C. §§ 7, 12(a). Accordingly, as a matter of law, any collaboration with foreign growers does not necessarily destroy the Capper-Volstead exemption.

A few courts have touched on the issue, but those cases are barely worth noting. For example, in *Northern Cranberries Inc., v. Ocean Spray, Inc.*, 382 F. Supp. 2d 221 (D. Mass. 2004), the court interpreted the term "persons" in 7 U.S.C. § 291 to include foreign persons and entities such that they could be members of a domestic cooperative.

*Cranberries*, 382 F. Supp. 2d at 225-26.  However, the decision did not directly address whether a domestic cooperative would lose access to the Capper-Volstead exemption if it conspired with a foreign cooperative.  Similarly, in *United States v. Nat'l Board of Fur Farm Organizations, Inc.*, 395 F. Supp. 56, 57 (E.D. Wis. 1975), the court touched on the issue in the context of a motion to dismiss a criminal indictment.  The court noted that both the government and the defendants appeared to agree that a Capper-Volstead organization is not exempt from liability if the organization conspires with "other persons," but it never directly addressed the question of whether the foreign organizations were exempt under Capper-Volstead.  Instead, the court simply denied the motion to dismiss because the government was not obligated to negate the defense in the criminal indictment.  *Fur Farm*, 395 F. Supp at 57.

Finally, *United States v. Dairy Farmers of America, Inc.*, 2000 WL 33200552 (E.D. Pa. 2000) is not as helpful as suggested by Plaintiffs.  Plaintiffs suggest that the DOJ's view as to the inapplicability of the Capper-Volstead Act to foreign producers figured into the resolution to its challenge to the acquisition by the Dairy Farmers of America ("D.F.A.") of SODIALL North American Corporation, a subsidiary of a large foreign cooperative.  Plaintiffs cite the DOJ's competitive impact statement in that case, and suggest that central to DOJ's decision to block the merger was DOJ's determination that SODIALL did not have the benefit of the Capper-Volstead exemption.  The impact statement does indicate that DOJ believes that SODIALL did not have the benefit of the Capper-Volstead exemption.  (Dkt. 111, Ex. S.)  However, there is no discussion about

why SODIALL does not have the benefit of the exemption, or more importantly, whether a conspiracy between D.F.A. and SODIALL would deny application of the exemption to D.F.A.

After considering the statutory language and the limited number of cases which have addressed the issue, the Court concludes that an association does not lose its Capper-Volstead exemption by including, among its members, foreign corporations or legal entities.

## 2.    *TWOMBLY* MOTIONS

The defendants who seek a *Twombly* dismissal fall into four general categories: potato growers; licensors; marketers; and dehydrators.

### A.    The Potato Growers' Motion to Dismiss[10]

At its heart, this case is about a group of potato growers who allegedly agreed to reduce the supply of potatoes they produce so as to increase prices. *See DPC* ¶ 3. The

---

[10]  The potato growers' arguments are set forth in the following three motions:

(1)    *The Joint Motion*.  Numerous defendants filed this motion, but the *Twombly* arguments are asserted only by Wada Farms, Inc., Wada Farms Potatoes, Inc., Wada-Van Orden Potatoes, Inc., Wada Farms Marketing Group, LLC, Raybould Brothers Farms, LLC, Lance Funk, Snake River Plains Potatoes, Cornelison Farms, Keith Cornelison, and Michael Cranney.  Dkt. 79-1.

(2)    *The Larsen-Driscoll-Rigby Motion*.  Moving defendants are Blaine Larsen, Blaine Larsen Farms, Inc., Driscoll Potatoes, and Rigby Produce, Inc. Dkt. 75-1.

(3)    *The Pleasant Valley Motion*.  The sole moving defendant is Pleasant Valley Potato, Inc. Dkt. 73-1.

The first two motions raise common issues and will be addressed jointly under this heading.  The Pleasant Valley Motion raises separate issues and is addressed below. United II also moved for dismissal in the Joint Motion, but it is more accurately categorized as a dehydrator defendant.  United II's arguments are thus addressed below along with the other dehydrator defendants' motions for dismissal.

core allegations against the potato growers begin with a September 2004 meeting in

Blackfoot, Idaho, which is described in the complaints as follows:

> 167.  The potato cartel was first formalized when Mr. Wada organized a meeting of Idaho potato farmers in September of 2004 to discuss how to "curb production" and "boost prices" for potatoes.  At this meeting, Mr. Wada and Keith Cornelison (of Defendant Cornelison Farms) summoned 23 Idaho potato growers to an office in Blackfoot, Idaho to discuss how their collective efforts at reducing potato supplies would help fix, raise, maintain, and stabilize prices.

> 168. After more meetings, phone calls, and emails among these growers, the group agreed to form UPGI - with the explicit goal of reducing potato supplies through various means.

> 169.  The 23 growers in attendance at this meeting became the founders of UPGI, which filed for incorporation on November 2, 2004. The founders' operations encompassed approximately 60 percent of the fresh potatoes produced in Idaho and 25 percent of the fresh potato market in the United States.
> . . .
> 171.  In the Articles of Incorporation of UPGI, the stated purpose of the organization is "to stabilize potato prices and supplies in the State of Idaho and to work with similar cooperatives in other states having similar purposes."

*DPC* ¶ 167-69, 171.  The growers who are identified as having attended the meeting

include the moving grower defendants.  *Id.* ¶ 170.  It further alleges that these growers

were founding members of UPGI and that they "explicitly signed on to the supply

reduction and price-fixing scheme alleged herein."  *Id.*  The DPC goes on to detail

various acts taken after the 2004 meeting to implement the conspiracy, including, among

other things:

- •    Yearly acreage reductions rules, meaning that the growers planted fewer potatoes;

- A bid buy-down program, whereby growers were paid not to plant potatoes;

- "Shipping holidays," during which packing plants were shut down for at least eight hours; and

- "Flow-control" activities, whereby certain defendants allegedly participated in marketing calls in an effort to prevent potatoes from being shipped when prices were too low.

- "Offloading" surplus potatoes by selling them to dehydration plants.

*DPC* ¶¶ 118, 185-90; *see also IPC* ¶¶ 221-27.

The grower defendants contend that these allegations fail to plausibly allege a § 1 conspiracy as to each individual defendant. They make two basic arguments in support of this contention. First, they argue that mere membership in a trade association such as UPGI or UPGA cannot form the basis of a § 1 conspiracy. *See Joint Mot. Memo.*, Dkt. 79-1, at 23. Second, they argue that plaintiffs have failed to allege each individual defendant's role in the alleged conspiracy with sufficient factual detail.

### (1). *The Membership Argument*

Turning first to the membership argument, defendants rely on *Kline v. Coldwell Banker & Co.*, 508 F.2d 226 (9th Cir. 1974) and *Kendall v. Visa U.S.A. Inc.*, 518 F.3d 1042 (9th Cir. 2008). In *Kline,* a group of real estate sellers sued a local realty board and thirty-two named brokers who were board members during the previous four years. Plaintiffs alleged that the defendants conspired to fix brokerage commissions at six percent by distributing a recommended fee schedule to its members. *Id.* at 228. The Ninth Circuit reversed the district court's grant of class certification because plaintiffs had

not shown that common questions predominated as to defendants' liability. *Id.* at 236. In so holding, the Court clarified that membership in the realty board, standing alone, was insufficient to impose liability. *Id.* at 233. Rather, "in order for a member of a trade association to become . . . liable in a treble damage case he must have 'knowingly, intentionally and actively participated in an individual capacity in the scheme.'" *Id.* at 232 (citation omitted).

The key difference between *Kline* and this case is that in *Kline* plaintiffs did not allege that the realty board itself was created to effectuate a pre-existing agreement to violate antitrust laws. Here, by contrast, plaintiffs allege that UPGI and UPGA were formed for the sole purpose of managing potato supply and fixing prices. *See, e.g., DPC* ¶ 3. Further, defendants allege that the grower defendants were directly involved in the meetings and agreements leading to the formation of the cooperatives. This allegation – essentially, that UPGI and UPGA formalized an underlying § 1 conspiracy – is supported with "evidentiary factual" allegations. For example, plaintiffs allege that UPGA's website articulates its "Vision" as follows: "We will manage national potato supply so as to positively affect grower profitability." *Id.* ¶ 198; *see also id.* ¶ 164. As for UPGI, because it believed it had Capper-Volstead immunity, UPGI's stated corporate purpose is "to stabilize potato prices and supplies in the State of Idaho and to work with similar cooperatives in other states having similar purposes.'" *Id.* ¶ 171; *see also id.* ¶ 200 ("Our efforts are targeted at supply management in order to help growers receive a reasonable price for their crop.").

As such, these defendants did not merely join an extant trade association and then choose whether or not to follow suggested guidelines; rather, plaintiffs alleged that they first agreed to the conspiracy outlined in the complaint, and then created the trade associations to formalize and implement that agreement. *Kline* is thus inapposite.

*Kendall* does not support the grower defendants' membership theory either. In that case, plaintiffs alleged that a group of credit card companies and banks conspired to fix two separate fees related to credit card transactions – an interchange fee and a merchant discount fee. *Kendall*, 518 F.3d at 1046. Regarding the interchange fee, the bank defendants successfully argued that plaintiffs had not plausibly alleged that the banks conspired to fix the interchange fee. *Id.* at 1048. Rather, according to the banks, Visa and MasterCard set these fees and the banks chose to adopt them. *See id.* This prompted the Ninth Circuit to invoke *Kline* in dismissing the complaint against the banks:

> Regarding the allegations that the Banks conspired to fix the interchange fee, merely charging, adopting or following the fees set by a Consortium [Mastercard or Visa] is insufficient as a matter of law to constitute a violation of the Sherman Act. In *Kline,* we held that membership in an association does not render an association's members automatically liable for antitrust violations committed by the association.

*Id.* at 1048 (internal citation to *Twombly* omitted).

A handful of grower defendants argue that they are in an analogous position to the bank defendants in *Kendall. See Larsen-Driscoll-Rigby Mot. Memo.*, Dkt. 75-1, at 7-8; *Hearing Transcript*, Dkt. 151, at 208-12. These defendants point out that the bank defendants in *Kendall* were owner-members of Visa (which defendants liken to a

"cooperative"), just as the potato growers here are members of cooperatives. S*ee Larsen-Driscoll-Rigby Reply*, Dkt. 130, at 4. They also argue that the interchange fee in *Kendall* was "enforced in a mandatory way on all members [and] could not be varied, . . . ." *Hearing Transcript*, Dkt. 151, at 209; *see also, e.g., Larsen-Driscoll-Rigby Reply*, Dkt. 130, at 4-5.

These grower defendants then proceed to argue that they are just like the banks: They may have planted fewer potatoes because UPGI and UPGA had mandatory acreage-reduction (and other rules), but being a member of that cooperative, and merely adopting or following cooperative rules cannot give rise to § 1 liability under *Kendall* and *Kline*. *See, e.g., Hearing Transcript*, Dkt. 151, at 210 (at oral argument counsel asserted that "the mere fact that some member of the institution is required to charge or adopt or follow the fees – or in this case it would be the acreage limitation rules or other practices set down by the association – does not, as a matter of law – the Ninth Circuit's term – give rise to a claim.").

This argument has two problems. First, although the *Kendall* plaintiffs alleged that the banks participated in the management of, and held a propriety interest in Visa and MasterCard, the banks successfully argued that they did not conspire to set the interchange fee. *See Kendall*, 518 F.3d at 1048 (holding that although plaintiffs alleged that the banks actively participated "in an individual capacity in the scheme to fix the interchange fee or the merchant discount fee, this was nothing more than a conclusory statement."). Here, by contrast, plaintiffs have provided evidentiary factual allegations

that the moving grower defendants met and agreed to the scheme alleged in the complaint.  Now, of course, whether that can be proven remains to be seen – either at trial or in the context of a motion for summary judgment.   But, for purposes of a motion to dismiss, it is sufficient that the plaintiffs have alleged that the defendants met and agreed to the scheme.

Second, the grower defendants' argument that the interchange fees were "enforced in a mandatory way" was not part of the Ninth Circuit's holding and appears to be controverted by the record in that case.  In district court proceedings, Visa and MasterCard repeatedly asserted that each network permitted member banks to opt out of the default interchange fees and apply different arrangements between particular acquirers and issuers.[11]  The Ninth Circuit did not find to the contrary on appeal.

*Kendall* is thus distinguishable.  Among other things, plaintiffs have plausibly alleged that the growers themselves came together and agreed to reduce potato supply and stabilize prices.  Such allegations were not present in *Kendall*.

### (2).    *The Who-What-Where-When Argument*

In addition to arguing that their "mere membership" in the cooperatives cannot form the basis for liability, the moving grower defendants argue that plaintiffs have not

---

[11]    *See* Answering Brief of Defendants-Appellees Mastercard International Inc. and Visa U.S.A. Inc., *Kendall*, 518 F.3d 1042 (available at 2006 WL 2378330, at *16, *19); *see also* Defendant Visa U.S.A. Inc.'s Miscellaneous Administrative Request for Leave to File a Motion for Summary Judgment, *Kendall v. Visa U.S.A. Inc.*, Case No. C04-4275-JSW (N.D. Cal. Mar. 11, 2005), at 1 ("Visa *does* allow its members to 'opt out' of Visa's default interchange rates, . . . ."); MasterCard's Proposed Motion for Summary Judgment, *Kendall District Court Dkt.* 53-1, at 7 ("Although MasterCard sets default interchange rates for the convenience of its members, no rules require them to use them. . . .  In fact, MasterCard's members can opt out of the default interchange rates in at least three ways: . . . .").

sufficiently connected each individual defendant to the alleged conspiracy. To resolve

this argument requires the Court to resolve the parties' underlying dispute as to the

correct pleading standard in antitrust cases following the Supreme Court's decision in

*Bell Atlantic Corp. v. Twombly,* 550 U.S. 524 (2007) and the Ninth Circuit's decision in

*Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042 (9th Cir. 2008). The parties have

fundamentally different views of these cases. In particular, the parties dispute how

detailed an antitrust complaint must be in answering the "basic questions: who, did what,

to whom (or with whom), where, and when?" *Id.* at 1047. The Court will explore

*Twombly* and *Kendall* in some detail before turning to the allegations in this case.

**(a)**     *Twombly* **and** *Kendall*

In *Twombly*, the plaintiffs alleged that a group of telephone companies – the Baby

Bells[12] – were engaging in "parallel behavior." In other words, they were not competing.

But that's all plaintiffs alleged to support their inference that the Baby Bells must have

entered into an illegal conspiracy. The core allegation was simply that

> [i]n the absence of any meaningful competition between the [defendants] in
> one another's markets, and in light of the parallel course of conduct that
> each engaged in to prevent competition from [other carriers] within their
> respective local telephone and/or high speed internet services markets and
> the other facts and market circumstances alleged above, Plaintiffs allege
> upon information and belief that [the defendants] have entered into a
> contract, combination or conspiracy to prevent competitive entry in their
> respective local telephone and/or high speed internet services markets and
> have agreed not to compete with one another and otherwise allocated

---

[12] The Baby Bells, as they were known, were regional telephone companies that were the successors to the Bell Operating Companies that AT&T had been forced to divest in settlement of the government's antitrust suit against it. *See Twombly*, 550 U.S. at 548, 550 n.1.

customers and markets to one another.

*Id.* at 551.

The problem with this allegation is that § 1 of the Sherman Act does not require sellers to compete; it just forbids their agreeing not to compete.  Further, the Supreme Court found that the Baby Bells had "tremendous independent economic incentive to resist 'sharing' and to forego entering one another's markets at the pain of being forced to subsidize a competing long distance carrier by sharing equipment."  *In re Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d 987, 1004 (E.D. Mich. 2010) (citing *Twombly*, 550 U.S. at 566).

Thus, the *Twombly* complaint merely alleged a fact – parallel behavior – that was equally consistent with two competing inferences: (1) an inference that the defendants were conspiring and; (2) an inference that market conditions enabled them to avoid competing without having to agree not to compete.  The Court concluded that without more, this independent, economically self-motivated behavior was not enough to sustain a conspiracy claim.  Instead, the Court held that allegations of parallel conduct must be placed in a factual context that "plausibly suggests" an agreement.  *Id.* at 556-57.

In footnote 10 of its opinion, the Court explained just how barren the complaint was.  *Id.* at 565 n.10.  In this oft-cited footnote, the Court explained that Twombly's conspiracy allegations, standing alone, probably would not even provide the defendants the notice required by Rule 8.  *Id.* at 565 n.10.  Indeed, the only specific thing Twombly did to show a conspiracy was to identify "the seven-year span in which the § 1 violations

were supposed to have occurred . . . ." *Id.* Otherwise, the pleadings "mentioned no specific time, place, or person involved in the alleged conspiracies." *Id.* As a result, it furnished "no clue as to which of the four ILECs (much less which of their employees) supposedly agreed, or when or where the illicit agreement took place." *Id.* A defendant seeking to respond to such a complaint "would have little idea where to begin." *Id.*

Less than a year after the Supreme Court handed down *Twombly*, the Ninth Circuit decided *Kendall*. In reciting the new plausibility standard announced in *Twombly*, the *Kendall* Court cited *Twombly*'s footnote 10, stating that Supreme Court "suggested that to allege an agreement between antitrust co-conspirators, the complaint must allege facts such as a 'specific time, place, or person involved in the alleged conspiracies,' to give a defendant seeking to respond to allegations of a conspiracy an idea of where to begin." *Id.* at 1047 (citing *Twombly*, 550 U.S. at 565 n.10). Notably, the *Kendall* complaint was as barren as *Twombly*'s. In dismissing the complaint, the Court found that even after conducting discovery, "the complaint does not answer the basic questions: who, did what, to whom (or with whom), where, and when?" *Id.* at 1048.

In the wake of *Twombly* and *Kendall*, antitrust defendants have relied on footnote 10 and the who-what-where-when language in *Kendall* to argue that complaints filed against them are deficient – even when complaints contain detailed "evidentiary factual" allegations connecting them to the alleged conspiracy. *See, e.g., In re Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d at 1008 ("Defendants continue to sound the who, what, when and where refrain throughout their briefs . . . ."). Many courts have rejected such

arguments (including district courts within the Ninth Circuit), concluding that the Supreme Court did not impose the elaborate "who-what-where-when" pleading requirement defendants insisted upon.[13]

> ### (b) *Plaintiffs' Who-What-Where-When Allegations*

Turning to plaintiffs' allegations in this case, the Court finds that plaintiffs have alleged sufficient evidentiary facts connecting the moving grower defendants to the alleged conspiracy.[14] This complaint does answer the basic who-what-where-when question. Specifically: *Who?* Twenty-three growers, including the moving grower defendants. *What?* Met and agreed to reduce potato supply and fix prices. *When?* Fall 2004. *Where?* An office in Blackfoot, Idaho.

Because these basic questions are answered, and the defendants have supplied additional factual detail regarding the activities of the group thereafter (albeit not on a defendant-by-defendant basis), the moving defendants have "an idea of where to begin" in responding to the complaint. *See Kendall*, 518 F.3d at 1047.

---

[13] *See, e.g., In re TFT-LCD (Flat Panel) Antitrust Litig.*, 599 F. Supp. 2d 1178, 1183 (N.D. Cal. 2009) ("Contrary to defendants' suggestions, neither *Twombly* nor the Court's prior order requires elaborate fact pleading."); *In re Packaged Ice*, 723 F. Supp. 2d at 1005 ("*Twombly* imposed no such requirement); *In re Southeastern Milk Antitrust Litig.*, 555 F. Supp. 2d 934 (E.D. Tenn. 2008) (holding sufficient complaints that "while not answering all specific questions about 'who, what, when and where,' do put defendants on notice concerning the basic nature of their complaints against the defendants and the grounds upon which their claims exist"); *see also Starr v. Sony BMG Entm't*, 592 F.3d 314, 325 (2d Cir. 2010); *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1024 (N.D. Cal. 2007) (plaintiffs need not plead "specific back-room meetings between specific actors at which specific decisions were made").

[14] Pleasant Valley is an exception. Additionally, plaintiffs' allegations relating to various Wada entities makes it unclear which particular Wada entity is alleged to have joined the purported conspiracy. Issues specific to these defendants are discussed below.

Some defendants argue that the language in the complaint suggesting that the defendants "signed onto" or "participated" in the supply-reduction/price-fixing scheme are "conclusory allegations" that "must be disregarded." *Joint Reply*, Dkt. 134, at 11. In a vacuum, such terms would be conclusory. But that is not so here. Plaintiffs have supported these allegations with sufficient factual detail. As noted, the moving grower defendants attended the 2004 meeting and agreed to reduce supply of and fix prices for potatoes.

As for the subsequent conduct of these defendants, at this stage plaintiffs do not need to provide elaborately detailed who-what-where-when facts for every single act that the moving grower defendants allegedly took to implement the scheme. Yet this is what defendants seem to demand. For example, in the *Larsen-Driscoll-Rigby* motion, defendants take issue with the following allegation, and, in particular, the use of the disjunctive "and/or":

> All Defendants involved in potato growing and selling operations herein . . . . were direct participants in the supply reduction scheme outlined herein and followed acreage reductions, participated in the bid-buy-down program, participated in and utilized information obtained from marketing calls and packing reports, *and/or* reduced the domestic supply of potatoes for the express purposes of fixing, raising, maintaining *and/or* stabilizing prices.

*DPC* ¶ 246 (emphasis added). These defendants argue that they do not have proper notice of what they allegedly did, asking: "Did Larsen 'participate' in the bid buy-down program? Or 'utilize' information from marketing calls and packing reports? Or both? What about Driscoll? Rigby?" *Larsen-Driscoll-Rigby Mot. Memo.,* Dkt. 75-1, at 9.

Defendants go on to state that the "obvious explanation is that plaintiffs don't know." *Id.*

Defendants ask too much. Plaintiffs have alleged – with the requisite factual specificity – the moving grower defendants' agreement to reduce potato supply and fix and elevate potato prices. This adequately describes their basic role in the alleged scheme. The level of factual detail defendants demand here is more appropriately reserved for summary judgment. *See, e.g., In re Cathode Ray Tube (CRT) Antitrust Litig.*, 738 F. Supp. 2d 1011, 1022 (N.D. Cal. 2010); *In re Static Random Access Memory (SRAM) Litig.*, 580 F. Supp. 2d 896 (N.D. Cal. 2008) ("Defendants . . . rely upon the standard for a motion for summary judgment."). The Court will therefore deny the following grower defendants' motions to dismiss: (1) Blaine Larsen Farms; (2) Cornelison Farms; (3) Keith Cornelison; (4) Michael Cranney; (5) Driscoll Potatoes, Inc.; (6) Lance Funk; (7) Blaine Larsen; (8) Raybould Brothers Farms, LLC; (9) Snake River Plains Potatoes, Inc.; and (10) Rigby Produce, Inc. As explained next, the Court will grant the Pleasant Valley and Wada entities' motions to dismiss, although plaintiffs will be given leave to amend the complaint.

### (3). *Pleasant Valley and the Wada Entities*

Unlike the other moving grower defendants, Pleasant Valley argues that plaintiffs have not sufficiently connected it to the Fall 2004 meeting where the alleged conspiracy originated.[15] Typically, plaintiffs allege that a particular individual attended the meeting,

---

[15] During oral argument, Pleasant Valley's counsel asserted that Pleasant Valley is a packing shed only, and that it does not even grow potatoes. For purposes of this motion, however, the Court must assume the truth of plaintiff's allegation that Pleasant Valley is a grower.

and that the individual is "of" an entity defendant. For example, plaintiffs assert that "Lorraine Driscoll (of Driscoll Potatoes)" attended "the initial UPGI meeting" and "explicitly signed on to the supply-reduction and price-fixing scheme . . . ." *DPC* ¶ 170. Elsewhere, plaintiffs usually allege that the entity defendant "is a founding member of UPGI." *See, e.g., id.* ¶ 102 ("Driscoll Potatoes is a founding member of UPGI"). Plaintiffs were not entirely consistent in this regard; but, for the most part, the moving grower defendants did not take issue with this particular aspect of the pleading. That is, the entity defendants did not contend that the individuals who attended the meeting were not connected to them, or that the named individual did *not* attend the meeting on their behalf.

As already noted, Pleasant Valley is an exception. Plaintiffs allege that Pleasant Valley is a "founding member of UPGI." *DPC* ¶ 111. That allegation, in turn, rests on the allegation that Kim Wahlen attended the Fall 2004 meeting and "signed on to" the conspiracy alleged in the complaint. *Id.* ¶ 170. There are no allegations to indicate Mr. Wahlen's relationship to Pleasant Valley, or his ability to act on behalf of that entity. Rather, Plaintiffs connect Mr. Wahlen to Pleasant Valley only with the word *of*. *See id.* (identifying "Kim Wahlen (of Pleasant Valley Potato)").

This allegation – basically, the word "of," – is not sufficient to plausibly allege that Mr. Wahlen had the authority to, or did, act on Pleasant Valley's behalf, or attend that meeting on Pleasant Valley's behalf. *Cf. Acosta Orellana v. Croplife Int'l*, 711 F. Supp. 2d 81, 112 (D.D.C. 2010) (formulaic recitations of the essential elements of agency will

not suffice).  Plaintiffs have therefore failed to allege facts connecting Pleasant Valley to the scheme outlined in the complaint and dismissal with leave to amend is appropriate.

The Court also takes judicial notice of UPGI's articles of incorporation, which do not list Pleasant Valley as a founding member.  *See* Fed. R. Evid. 201(b); *MGIC Indem. Corp. v. Weisman*, 803 F.3d 500, 504 (9th Cir. 1986).  As certified public records kept by the Secretary of State in Idaho, the articles fall directly within the category of documents the Ninth Circuit generally considers proper for judicial notice.  *Weisman*, 803 F.3d at 504.  This Court may consider the articles as part of a 12(b)(6) motion without converting that motion to one for summary judgment.  *Id.*

Various Wada entities make a related argument.  In essence, these defendants contend that plaintiffs named them as defendants only because they carry the Wada name and because Albert Wada, the individual, is an alleged "mastermind" of the conspiracy.

Plaintiffs name the following Wada entities as defendants:  (1) Wada Farms, Inc.; (2) Wada Farms Potatoes, Inc.; (3) Wada Van-Orden Potatoes, Inc.; and (4) Wada Farms Marketing Group, LLC.  *DPC* ¶¶ 30-32, 45.  Plaintiffs then define the first three entities as "Wada Farms," and then allege that "Wada Farms through Albert Wada, played a critical role in the formation of UPGI and UPGA and the implementation of the supply reduction conspiracy."  *Id.* ¶ 38; *see also id.* ¶ 170 (alleging that "Albert Wada (*of Wada Farms*)" attended "the initial UPGI meeting" and "explicitly signed on to the supply reduction and price-fixing scheme . . . .") (emphasis added).  Plaintiffs also allege that "Defendant Albert Wada is the Chairman and former CEO of Wada Farms."  *Id.* ¶ 38.  In

context, it is not clear if plaintiffs are alleging that Mr. Wada is the chairman and former CEO of all three entities.

These allegations do not allow the reader to figure out why each corporate entity has been named as a defendant, or what its connection to the underlying scheme is. With three entities lumped together as one ("Wada Farms"), the complaint fails to sufficiently connect each corporate defendant to the scheme. Plaintiffs will be given leave to amend in order to clarify how each entity is allegedly connected to the scheme.

As for Wada Farms Marketing,[16] plaintiffs allege that it is the "sales and marketing arm of Wada Farms" and that it "participated in and benefitted from the conspiracy." *Id.* ¶ 49. Plaintiffs further assert that "Wada Farms controls Wada Farms Marketing and Wada Farms Marketing acted pursuant to that control." *Id.* ¶ 50; *see also id.* ¶ 51 ("Wada Farms Marketing acted as Wada Farms' agent.").

Plaintiffs attempt to connect all marketer defendants to the complaint with allegations such as these: "Idaho marketing calls were implemented" and prior to these calls "participating warehouses would log on the UPGI web-page and provide information on capacity, stocks and pack-outs. These data along with other information . . . were discussed and . . . summarized . . . on the internet to assist with 'flow-control' and prevent potatoes from being shipped when prices were too low." *Id.* ¶ 190.

---

[16]  As its name suggests, Wada Farms Marketing is more accurately characterized as a marketer defendant.  Nonetheless, the Court will address Wada Farms Marketing here, given the similarity of its argument to the other Wada entity defendants.

These allegations do not sufficiently connect Wada Farms Marketing to the scheme. The control allegations are too conclusory, and the other allegations do not specifically implicate Wada Farms Marketing. The Court will dismiss the complaint as to Wada Farms Marketing but will grant plaintiffs leave to file an amended complaint to allege how Wada Farms Marketing is connected to the scheme.

**B.      Licensor Defendants – Dole's Motion to Dismiss**

Dole Food Company Inc. and Dole Fresh Vegetables are named as licensor defendants. *See DPC* ¶¶ 52-66; *IPC* ¶¶ 132-45. These defendants do not grow or sell their own potatoes. Rather, Dole Fresh Vegetables licenses Wada Farms Marketing the right to place the DOLE® label on Wada-grown potatoes. This licensing relationship has been in existence for roughly 15 years.

The Dole defendants contend that because this is all they do (that is, license their brand name[17]) they should be dismissed from this action. More specifically, Dole argues that plaintiffs fail to sufficiently allege it participated in the price-fixing/supply-reduction conspiracy alleged in the complaint. Dole also argues that plaintiffs fail to properly plead an agency relationship that would give rise to vicarious liability.

**(1).      *Direct Participation*[18]**

---

[17]   The Court refers to both Dole entities as "Dole" herein. To be clear, however, Dole Fresh Vegetables, not Dole Food Company Inc., is the licensor. Although the parties dispute whether plaintiffs can "impute" the license to Dole Food Company Inc., the Court does not need to resolve this question to decide Dole's motion.

[18]   For purposes of this motion, the Court assumes, without deciding, that Dole may be liable as a direct participant in the scheme. *See generally Am. Soc. of Mech. & Elec. Eng'rs v. Hydrolevel*, 456 U.S. 556, 569 (1982) (non-profit, standard-setting association liable for § 1 violation of Sherman Act; the

As to Dole's allegedly direct participation in the scheme, there are just a few allegations. Both complaints allege: "During the Class Period, Dole Fresh Vegetables participated in the supply-restriction and price-fixing scheme . . . alleged herein." *DPC* ¶ 52; *IPC* ¶ 133; *see also DPC* ¶ 246; *IPC* ¶ 268 (alleging, parenthetically, that Dole Food was a "direct participant in the supply reduction scheme outlined herein . . . .").

These conclusory statements are not amplified with sufficient evidentiary factual allegations. Plaintiffs do not allege, for example, that Dole attended the supply-reduction meetings described in the complaint. Nor do plaintiffs allege that Dole "signed on" to any supply-reduction agreement reached at those meetings. Instead, the complaint rests almost entirely on the existence of the licensing arrangement described above.

But the fact that Dole entered into a licensing agreement several years before the alleged conspiracy began does not sufficiently link Dole to the conspiracy. Nor are there any other allegations in the complaint that would allow the Court to infer that Dole directly participated in the alleged conspiracy. Although the allegations need not include elaborate detail, the complaint must allege that each individual defendant joined the conspiracy and played some role in it. After all, the hallmark of an antitrust conspiracy is a "common scheme designed to achieve an unlawful objective." *Monsanto,* 465 U.S. at 764, and each individual defendants' conscious commitment to that scheme.

### (2). *Agency Theory of Liability*

Given the deficiency of the direct-liability allegations, plaintiffs are left with their

---

association did not produce or sell the mechanical device at issue).

agency allegations.  *See generally Am. Soc. of Mech. & Elec. Eng'rs v. Hydrolevel*, 456

U.S. 556, 569 (1982) (defendants may be held liable for Sherman Act violations under an

agency theory of liability).  As with other allegations in the complaint, plaintiffs are not

permitted to rest on conclusory allegations to properly plead an agency relationship.  *See*

*Acosta Orellana*, 711 F. Supp. 2d at 112 (formulaic recitations of the essential elements

of agency will not suffice); *Millar v. Pitman Bd. of Educ.*, 2011 WL 2417141 (D.N.J.

June 13, 2011) (citing cases); *Imagineline, Inc. v. CafePress.com, Inc.*, 2011 WL 1322525,

at *4 (C.D. Cal. Apr. 6, 2011) ("To sufficiently plead an agency relationship, a plaintiff

must allege facts demonstrating the principal's control over its agent.").

The principles of agency law at issue here – actual authority and apparent authority

– are well settled:  "Actual authority consists of powers which a principal directly confers

upon an agent, as well as those the principal causes or permits the agent to believe he or

she possess."  2A C.J.S. *Agency* § 133; *see also* Restatement (Third) Agency § 2.01

(2006); *Sun Microsystems, Inc. v. Hynix Semiconductor Inc.*, 622 F. Supp. 2d 890, 899

(N.D. Cal. 2009) (federal common law of agency applies, as guided by principles set forth

in the Restatement of Agency).  Apparent authority focuses on third parties.  It arises

when a third party reasonably believes that the putative agent had authority to act on

behalf of the principal and  that belief can be traced to the principal's own manifestations.

*See* Restatement (Third) Agency § 2.03 & cmts. c, d.  Apparent authority is "basically an

estoppel principle which operates in favor of third parties seeking to bind a principal for

unauthorized acts of its agents."  2A C.J.S. *Agency* § 391.

Plaintiffs' complaints contain brief, conclusory allegations that the "Wada Defendants acted as the Dole Defendants' agent in participating in the price-fixing and capacity reduction scheme alleged herein." *DPC* ¶ 62; *IPC* ¶ 133. The more specific factual allegations intended to support these allegations arise out of the licensor-licensee relationship. *See DP Opp.*, Dkt. 110, at 57 (arguing that "the Dole Defendant's relationship with the Wada Defendants goes well beyond that of traditional licensor-licensee"). For example, plaintiffs allege that "Wada Farms Marketing holds the exclusive marketing agreement for potatoes, onions, and sweet potatoes sold under the national Dole label" and that due to this relationship, the Wada Defendants "enjoyed frequent contact with and supervision from the Dole representatives." *DPC* ¶¶ 47, 61; *see IPC* ¶ 135, 141.

Plaintiffs also allege that "[a]s licensor of the potatoes sold by the Wada Defendants, the Dole Defendants had control over many aspects of the marketing, selling, packaging, quality and branding of these potatoes." *DPC* ¶ 61; *see IPC* ¶ 135, 141. They go on to quote the following statement from the Wada Farms' website that discusses the Dole/Wada relationship:

> Our relationship with Dole started approximately 15 years ago based on a mutual commitment to provide the highest quality products and service to every customer. The Dole brand has been around for over a century and means the finest, high-quality products. Through Wada Farms Marketing Group, Dole will continue to meet customers' expectations by consistently providing potatoes and onions that meet the highest standard. With the combined program and experience of Wada Farms, there are unlimited opportunities with the National Dole label for potatoes, onions, and sweet potatoes. For Wada and Dole, anything less is unacceptable.

*DPC* ¶ 47; *see IPC* ¶ 78 (same quote, with minor omissions).

Plaintiffs allege that through this webpage, along with other, unspecified "representations to various third parties and the public," Dole and Wada "confirmed" that "Wada was acting on Dole's behalf and as Dole's agent in the production, marketing and sales of Dole potatoes." *DPC* ¶ 64; *IPC* ¶ 143.

But neither the website statement nor any of the other allegations supports the sweeping conclusion that Dole invested the Wada defendants with actual or apparent authority "to act on Dole's behalf, including by reducing the supply of Dole-branded potatoes . . . ." *DPC* ¶ 63. The allegations in this regard are benign (such as the allegation that Dole was in frequent contact with Dole) or conclusory (such as the allegation that Dole "supervised" or otherwise "controlled" Wada[19] ). Moreover, Dole does not grow or sell potatoes. Consequently, under the facts alleged in this complaint, it does not seem plausible that Dole would be in a position to "control" the potato growers.

At most, plaintiffs' allegations show that Dole and Wada have united interests on particular issues, such as their "mutual commitment to provide the highest quality products and service to every customer." *DPC* ¶ 47; *IPC* ¶ 78. But the mere fact that Dole and Wada have some united interests is not enough to plausibly suggest that one is

_____

[19] This particular allegation is contained in the direct-purchaser complaint. *See DPC* ¶ 63 ("Throughout the Class Period, the Dole Defendants exercised actual or apparent authority over the Wada Defendants as those Wada entities publicly and repeatedly announced their intentions to reduce potato supplies nationwide and encouraged competitors to do the same. The Dole Defendants invested authority in the Wada Defendants to act on Dole's behalf, *including by reducing the supply of Dole-branded potatoes, despite knowing of the Wada Defendants' efforts to restrict potato supplies and fix prices nationwide with their co-conspirators*) (emphasis added). The later-filed indirect-purchaser complaint omits the italicized language. *See IPC* ¶ 142.

MEMORANDUM DECISION AND ORDER - 41

the agent of the other. There must be some indication that one entity is directing the other. *See Acosta Orellana v. Croplife Int'l*, 711 F. Supp. 2d 81, 115 (D.D.C. 2010) ("Regardless of how united [two parties] might be with respect to any particular issue, there can be no principal-agent relationship absent some indication that the position of one of the entities was taken *at the direction of the other*.'") (citation omitted). Here, plaintiffs' agency allegations regarding Dole are far too conclusory for this Court to infer that Wada was acting as Dole's agent, and the string of authorities plaintiffs cite, *see DP Opp.,* Dkt. 110, at 50-52, does not support a contrary conclusion.

In sum, plaintiffs have failed to sufficiently allege that Dole participated – either directly or indirectly – in the alleged conspiracy. Dismissal of the § 1 claim against Dole is thus appropriate.

The Court will also dismiss the indirect purchasers' state-law claims against Dole. In its moving papers, Dole asserted that if the conspiracy claim against it fails, all of the indirect purchasers' state-law claims necessarily fail in that they expressly hinge on pleading conspiracy. *Dole Mot. Memo.*, Dkt. 88-1, at 13-14. Plaintiffs apparently concede the point; they did not respond to that argument.

Finally, given the weakness of the allegations against Dole, the complaint against Dole will be dismissed with prejudice. *Associated Gen. Contractors of Cal., Inc. v. Carpenters*, 459 U.S. 519, 528 n.17 (1983) ("a district court must retain the power to insist upon some specificity in pleading before allowing a massive factual controversy to proceed").

## C.    Marketing Defendant – Potandon's Motion to Dismiss

Potandon Produce L.L.C. sells potatoes and onions to major retailers, club stores, wholesalers, produce distributors and restaurant chains. *IPC* ¶ 88. The company is owned by five prior Pillsbury managers and "six grower/shippers." *Id.* Potandon is the marketing agent for several Idaho potato growers, including defendant Larsen Farms. *Id.* ¶ 89.

### (1).    *Direct Participation*

Potandon argues that it is peripheral to any conspiracy alleged in this action because it does not grow potatoes. Plaintiffs, however, insist that Potandon was directly involved in the conspiracy because Potandon participated in the "flow-control" measures alleged in the complaint. *See DP Opp.*, Dkt. 110, at 35. Per the plaintiffs, flow control is exactly what it sounds like – controlling the number of potatoes that flow into the marketplace. Plaintiffs allege that flow-control efforts include basic monitoring of the marketplace and then reducing supply when deemed necessary by, for example, donating potatoes to food banks or imposing "shipping holidays" in which potato-packing operations shut down for eight or more hours. *See DPC* ¶¶ 189-91, 209-210.

The problem with plaintiffs' theory is that their flow-control and related allegations are not specifically directed at Potandon. Counsel essentially conceded this point at oral argument. *See Hearing Transcript*, Dkt. 151, at 263.

Plaintiffs also argue that the Court should simply infer Potandon's direct involvement based on the Potandon's size and role in the industry. Plaintiffs allege that

Potandon is the largest potato marketer in North America, controlling 25% of the Idaho potato market. *DPC* ¶¶ 72, 77. Thus, according to plaintiffs, the Court should just understand that "the conspiracy could not have operated without Potandon's direct and significant involvement given its size and role." *DP Opp.*, Dkt. 110, at 36.

This argument is contrary to cases holding that an antitrust plaintiff must "allege that each individual defendant joined the conspiracy and played some role in it because, at the heart of an antitrust conspiracy is an agreement and a conscious decision by each defendant to join in." *In re Elec. Carbon Prods.*, 333 F. Supp. 2d at 311-12. Under this standard, plaintiff's allegation that Potandon directly participated in the alleged conspiracy is insufficient.

### (2). *Liability as Marketing Agent*

In addition to claiming that Potandon was directly involved in the conspiracy, Plaintiffs allege Potandon is liable as a marketing agent for certain of the grower defendants.

A marketing agent is not liable for the acts of its alleged principal in a § 1 conspiracy unless the agent (1) had "knowledge of its supplier's purpose to restrain trade," (2) "intended to restrain trade itself rather than simply earn its usual and customary commission," and (3) contribute[d] materially to the restraint." 7 Herbert Hovenkamp & Philip E. Areeda, *Fundamentals of Antitrust Law* ¶ 1474c (3d ed. 2010). A defendant that does not meet each of these requirements "does not share a 'conscious commitment to a common scheme designed to achieve an unlawful objective,' as the

Supreme Court has required. *Id.* (quoting *Monsanto,* 465 U.S. at 764).

Plaintiffs have wholly failed to plead two of these requirements – knowledge and material contribution. Instead, plaintiffs ask the Court to infer facts supporting Potandon's alleged knowledge of and material contribution to the alleged conspiracy. *See, e.g., DP Opp.*, Dkt. 110, at 39. As for the third requirement – intent – plaintiffs rely on a conclusory allegation, along with allegations that do not mention or otherwise implicate Potandon. *See id.* (citing *DPC* ¶¶ 80, 186, 189, 214).

These allegations are deficient. The three elements articulated above must be pled, and those ultimate allegations must be supported with evidentiary factual allegations.

### (3). *Corporate Control and Ownership Theories of Liability*

In addition to claiming that Potandon is liable as a direct participant or as a marketing agent for a conspirator, plaintiffs suggest that Potandon is liable by virtue of its corporate ownership structure. In that regard, plaintiffs allege:

> Potandon is owned and/or controlled by its suppliers and has conspired with its potato growers to assist in efforts to reduce potato supplies and fix prices and has directly profited from the price fixing scheme detailed herein.

*DPC* ¶ 80.

This allegation is not sufficient to connect Potandon to the alleged conspiracy. The allegation that Potandon "conspired with its potato growers" is a bare conclusion. And Potandon – a separate corporate entity – cannot be implicated in the conspiracy based solely on the fact that one of its owners is an alleged conspirator. *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 341 n.44 (3d Cir. 2010). Plaintiffs have not

plausibly alleged that Potandon's separate corporate status should be ignored under any alter ego or agency theory of liability. *Cf. Hinds County v. Wachovia Bank*, 708 F. Supp. 2d 348, 367 (S.D.N.Y. 2010) (finding that plaintiffs had "plausibly alleged" that the legal fiction separating two corporate defendants "was illusory as to the transactions at issue . . . .").

*Allen v. Dairy Farmers of America, Inc.*, 748 F. Supp. 2d 323 (D. Vt. 2010), which the parties discuss at some length, supports dismissal of the complaint against Potandon. In *Allen*, dairy farmers sued various entities in the milk industry for antitrust violations. The defendants included a cooperative of dairy farmers; the cooperative's exclusive marketing agent; and two large milk bottlers, including defendant HP Hood LLC. *Id.* at 330-31. The allegations against Hood were based on little more than (1) Hood was a large milk bottler, (2) another defendant (the dairy farmers' cooperative) had a 15% ownership interest in Hood, (3) an allegation that the cooperative "exercised control over all of the milk supplied to Hood; . . ." and (4) an allegation, "wholly devoid of facts" that Hood benefitted from the underlying conspiracy. *Id.* at 333-34. Based on these allegations – which failed to "alleged any *facts* regarding Hood's alleged agreement to conspire" – the district court granted Hood's motion to dismiss. *Id.* at 334 (emphasis in original).

The allegations against Potandon are similarly lacking; they are based primarily on Potandon's relative size, the fact that a grower defendant partially owns the company, and conclusory allegations of control and benefit. *Hood* thus supports Potandon's position.

The Court rejects plaintiffs' argument that Potandon is more analogous to the marketing agent sued in *Allen*.  Among other things, the *Allen* complaint contained sufficient factual allegations for the court to conclude that the dairy farmers' cooperative and its marketing agent "acted as one."  *Id.* at 344.  There are no such allegations here.  Dismissal of the complaint against Potandon is therefore appropriate.

At oral argument, however, plaintiffs indicated that, if given leave to amend, they intend to name Potandon as a direct participant in the flow-control measures described above.  The Court will grant the motion to dismiss, without prejudice to plaintiffs filing an amended complaint.

Finally, the Court rejects Potandon's argument that the Cooperative Marketing Act ("CMA"), 7 U.S.C. § 455, provides it with a separate and distinct form of immunity.  *See Potandon Mot. Memo.*, Dkt. 76-1, at 17-19.  Section 5 of the CMA allows cooperatives to use a common agent to "acquire, exchange, interpret, and disseminate" various types of information, including, for example, market information and information regarding "past, present, and prospective crop[s]."  7 U.S.C. § 455.  On its face, the CMA does not expressly state that the cooperative at issue must be a Capper-Volstead cooperative.  *See id.*  Potandon therefore argues that the CMA immunizes it from Sherman Act liability – even if the cooperatives Potandon serves are not Capper-Volstead cooperatives.

Potandon's argument fails based on the language of the CMA.  To be sure, the CMA does not expressly state that "Capper-Volstead cooperatives" may share market information though a common agent.  But Congress did copy the entire, cumbersome

definition of a Capper-Volstead cooperative and then paste it into the CMA, just before

the language stating what such a cooperative "may" do.  Section 5 of the CMA provides

that

> *Persons engaged, as original producers of agricultural products, such as farmers, planters, ranchmen, dairymen, nut or fruit growers, acting together in associations, corporate or otherwise, in collectively processing, preparing for market, handling, and marketing in interstate and/or foreign commerce such products of persons so engaged,* may acquire, exchange, interpret, and disseminate past, present, and prospective crop, market, statistical, economic, and other similar information by direct exchange between such persons, and/or such associations or federations thereof, and/or by and through a common agent created or selected by them.

7 U.S.C. § 455 (emphasis added).

The italicized language precisely describes a Capper-Volstead cooperative.  For

ease of reference, here again is the description of a Capper-Volstead cooperative, as

found in 7 U.S.C. § 291:

> Persons engaged in the production of agricultural products as farmers, planters, ranchmen, dairymen, nut or fruit growers may act together in associations, corporate or otherwise, with or without capital stock, in collectively processing, preparing for market, handling, and marketing in interstate and foreign commerce, such products of persons so engaged.

Given this duplicate language, it seems obvious that Congress intended the CMA

to apply to Capper-Volstead cooperatives.  Further, when it passed the CMA, Congress

stated that "nothing contained in this chapter is intended, nor shall be construed, to

modify, or repeal any of the provisions of sections 291 or 292 of [the Capper-Volstead

Act]."  7 U.S.C. § 457; *see also* Christine A. Varney, *The Capper-Volstead Act,*

*Agricultural Cooperatives, and Antitrust Immunity*, *The Antitrust Source*, Dec. 2010, at 2

n.10 (The CMA "authorizes Capper-Volstead-type cooperatives to acquire and exchange 'past, present, and prospective crop, market, statistical, economic, and other similar information.'"). Consequently, the CMA does not provide a separate immunity for Potandon.

### D. Dehydrator Defendants

The "dehydrator" defendants include United II, R.D. Offutt, and Idahoan Foods, LLC. Plaintiffs allege that these defendants participated in a 2007 joint venture whereby "R.D. Offutt partnered with Defendant United II to create . . . Idahoan Foods." *DPC* ¶ 117.

The deal allegedly included the following components: (1) UPGI formed United II, which is a second cooperative made up of some UPGI members; (2) R.D. Offutt contributed potato processing plants to the venture; (3) United II and R.D. Offutt own Idahoan Foods, which is a limited liability company; (4) Idahoan Foods acquired a company (Idaho Fresh-Pak) that had four dehydration plants; and (5) United II's grower-owners supply all the potatoes for Idahoan Foods' Idaho and Nevada plants. *Id.* ¶¶ 27-29, 118-20, 315-20; *IPC* ¶ 47, 153-55; *see also Hearing Transcript,* Dkt. 151, at 160.

Plaintiffs allege that Idahoan Foods was created as part of the overarching scheme to reduce the supply of potatoes that made their way to the market. As plaintiffs put it, the "joint venture enabled potato growers to offload surplus potatoes and further reduce supplies and thereby further facilitated and contributed to the price-fixing scheme alleged." *DPC* ¶ 118; *see also id.* ¶ 124; *IPC* ¶¶ 47-48, 157-58, 280, 315. In related

allegations, plaintiffs allege that UPGI explicitly and publicly stated the joint venture's purpose. *See, e.g., DPC* ¶ 315; *IPC* ¶ 328. For example, the complaint alleges:

- "UPGI also discussed this venture in its March 2007 newsletter and stated **United of Idaho [UPGI] feels that the current dehy strategy being implemented is critical to United's overall mission of supply management.**" *DPC* ¶ 319; *IPC* ¶ 332 (emphasis in complaints)

- "In December of 2007, UPGI announced the new 'Idahoan Fresh Potato Plan' as part of this venture and as a means to further control supplies and fix prices where UPGI proposed that growers sell 100% of their potatoes to Idahoan Fresh." *DPC* ¶ 320; *IPC* ¶ 333.

The dehydrator defendants argue that – notwithstanding allegations regarding UPGI's intentions for the joint venture – plaintiffs have alleged nothing more than a lawful, vertically integrated, pro-competitive agreement. Plaintiffs counter that they are not concerned with the vertical elements of the joint venture; rather, they are focused on a horizontal, price-fixing component within this vertical arrangement.

### (1). *United II and R.D. Offutt – The Joint Venture Partners*

As such, plaintiffs initially focus on the fact that both joint venture partners grow potatoes: R.D. Offutt is a large, North-Dakota-based grower, with 60,000 acres devoted to potatoes. *DPC* ¶ 127-30. United II is comprised of some UPGI members, all of whom grow potatoes. Plaintiffs next contend that these growers came together to figure out how they could divert fresh potatoes out of the fresh-potato market. The theory was explained during oral argument as follows:

> It all started with an agreement between Offutt and UPGI to initiate this program, this conduct in order to divert fresh potatoes out of the

fresh potato market.  And that was the key.

So what you have is a horizontal arrangement between UPGI and its member growers on the one hand, and Offutt, an enormous grower, on the other, a horizontal agreement.  And that's the genesis of the plan:  How are we going to set up a mechanism, which ultimately had some vertical components, but the key to it was the initiation of a horizontal agreement, which Offutt was a key participant.

*Hearing Transcript*, Dkt. 151, at 161.

Facts supporting this theory, however, are not alleged in the complaint.  In particular, plaintiffs have not alleged facts showing that "it all started with an agreement between Offutt and UPGI."

The factual allegations relating to United II are, mainly, that it is a cooperative made up of UPGI growers who wished to participate in the dehydration venture. Plaintiffs also allege that "UPGI, its members, and co-conspirators have conspired and colluded with 'United II' – a non-grower, vertically integrated potato purchaser, to assist with supply-restriction efforts."  *DPC* ¶ 257(h); *IPC* ¶ 5(viii).

As for R.D. Offutt, plaintiffs allege that in 2004, the company sent a representative to a November 2004 meeting regarding the formation of national and regional cooperatives.  *DPC* ¶ 173.  Unlike many other grower defendants, R.D. Offutt is not alleged to have joined any cooperative in 2004.  Plaintiffs also allege that in connection with "shutting down potato processing plants as part of this venture, Paul Noah, an R.D. Offutt official in North Dakota stated that "[i]n essence, there is excess capacity in the industry."  *Id.* ¶ 125.

Plaintiffs contend that these allegations – combined with the fact of the joint venture agreement – support an inference that R.D. Offutt agreed to the over-arching conspiracy described in the complaint. In particular, plaintiffs assert that R.D. Offutt must have been aware of UPGI's overall goals for the venture. But these facts are not sufficient to infer that R.D. Offutt viewed the transaction the same way UPGI did, or that it entered the transaction for these reasons. This is particularly true because there is an obvious alternative explanation for R.D. Offutt's participation in the venture – namely, that R.D. Offutt wanted to acquire potatoes for dehydration plants. As such, it becomes difficult for the Court to infer R.D. Offutt's larger agreement to the underlying conspiracy.

On this point, courts disagree as to whether the complaint itself needs to exclude the possibility of independent action, and the Ninth Circuit has yet to rule on this precise issue. Some courts, including the Third and Sixth Circuits, hold that if plaintiffs do not allege direct evidence of an agreement to restrain trade, they must allege "sufficient circumstantial evidence tending to exclude the possibility of independent conduct." *Watson Carpet & Floor Covering, Inc. v. Mohawk Indus., Inc.*, —F.3d—, 2011 WL 2462833, at *4 (6th Cir. June 22, 2011); *see also In re Ins. Brokerage*, 618 F.3d at 322-23 (conspiracy allegations deficient "if there are 'obvious alternative explanation[s]' for the facts alleged.") (quoting *Twombly*, 550 U.S. at 567). Others hold that "despite the need to show some factual context supporting a plausible inference of conspiracy, at the motion to dismiss stage a plaintiff need not allege facts that fully exclude 'independent self-

interested conduct as an explanation for defendant's parallel behavior." *LaFlamme v. Societe Air France*, 702 F. Supp. 2d 136, 151 (E.D.N.Y. 2010) (citing *Starr v. Sony BMG Entm't*, 592 F.3d 314, 325 (2d Cir. 2010)).

To a certain extent, these decisions are reconcilable. As the Court sees it, plaintiffs must allege facts *tending* to exclude independent action, but they need not allege facts that *fully* exclude it. The standard is properly viewed as a fluid one; that is, if plaintiffs allege strong circumstantial evidence of an agreement, there is less of a need to allege facts negating an obvious, independent reason for defendants' conduct. This reading of the cases is in accord with *Twombly*'s holding, where the Supreme Court "[a]cknowledg[ed] that parallel conduct' between two businesses "was consistent with an unlawful agreement, [but] nevertheless concluded that it did not plausibly suggest an illicit accord because it was not only compatible with, but indeed was more likely explained by, lawful, unchoreographed free-market behavior." *Iqbal*, 129 S. Ct. at 1950 (as quoted in *Watson Carpet*, 2011 WL 2462833, at *4).

Here, plaintiffs rely on circumstantial evidence to show that R.D. Offutt agreed to the overarching conspiracy alleged in the complaint – mainly UPGI's statements and the fact of the dehydration venture. Those factual allegations (even in combination with the more specific allegations described above) are weak in terms of suggesting that R.D. Offutt itself consciously committed to the conspiracy, particularly in view of the fact that there is an obvious alternative, independent explanation for R.D. Offutt's entry into the joint venture agreement. At most, plaintiffs have pled that R.D. Offutt had an opportunity

to join the conspiracy.  Such allegations are insufficient to "nudge plaintiffs' claims across the line from the conceivable to the plausible."  *Twombly*, 550 U.S. at 570; *cf. In re Fla. Cement & Concrete Antitrust Litig.*, 746 F. Supp. 2d 1291 (S.D. Fla. 2010) ("the opportunity to conspire does not on its own or when paired with parallel conduct suggest Defendants entered an agreement to fix prices"); *Hinds County v. Wachovia Bank*, 620 F. Supp. 2d 499 (S.D.N.Y. 2009) (participation in trade associations or conferences cannot support allegations of a conspiracy).  The complaints against R.D. Offutt will be dismissed.

Because the complaint fails to plausibly allege the dehydration agreement contained, as one of its component parts, a horizontal agreement whereby R.D. Offutt entered the underlying conspiracy, the allegations against the remaining dehydrator defendants collapse.

Turning first to R.D. Offutt's joint-venture partner, plaintiffs have not put forth sufficient evidentiary facts supporting the allegation that United II itself consciously committed itself to any underlying, horizontal conspiracy.  Some of its members may well have, as the Court has determined that the complaint plausibly alleges that certain grower defendants joined the alleged conspiracy.  But this does not necessarily bring United II into the fold.

In sum, the complaint plausibly alleges that UPGI viewed the dehydration venture as a key part of its supply-management efforts.  What the complaint does not do is allege that United II and R.D. Offutt joined the underlying conspiracy.  The complaint against

these defendants will therefore be dismissed with leave to amend.

### (2).    *The Joint Venture LLC – Idahoan Foods*

The complaint against the joint venture LLC itself, Idahoan Foods, LLC, will also be dismissed because there are no evidentiary factual allegations tying Idahoan to the scheme alleged in the complaint other than the fact of the dehydration joint venture agreement.  All plaintiffs have alleged at this point is that Idahoan purchases potatoes from some members of an alleged "potato cartel."  That, in and of itself, does not give rise to antitrust liability.  *See Rick-Mik Enters. v. Equilon Enters., LLC*, 532 F.3d 963 (9th Cir. 2008).  Further, as with R.D. Offutt, Idahoan has obvious independent, economically self-motivated reasons for entering into the transaction – to purchase potatoes.  The facts pled do not allow the court to reasonably infer that Idahoan *itself* conspired with the potato growers to reduce supply or fix prices.

The Court will therefore grant Idahoan Foods' motions to dismiss, with leave to file an amended complaint.

### 3.    INDIRECT PURCHASER CLAIMS

Defendants make three arguments why the Indirect Purchaser Plaintiffs ("IP" Plaintiffs) claims should be dismissed: (1) federal law pre-empts the IP Plaintiffs state law claims; (2) the IP Plaintiffs do not have standing under the laws of the states where they have not been injured; and (3) the IP Plaintiffs do not have standing to pursue antitrust claims.

With respect to the pre-emption argument, the IP Plaintiffs agree that they are not

seeking application of state antitrust laws beyond what Capper-Volstead immunizes for federal antitrust liability. With respect to standing under the laws of states where they have not been injured, Plaintiffs have agreed to amend their complaint to add plaintiffs in those states. Therefore, the only issue remaining is whether the IP Plaintiffs have standing to pursue antitrust claims.

There is no doubt that the IP Plaintiffs must establish antitrust standing. But what is required to allege enough facts to survive a motion to dismiss is less clear. Defendants initially argued that the factors listed by the Supreme Court in *Associated General Contractors of California v. California State Council of Carpenters*, 459 U.S. 519 (1983) ("*AGC*") provide the Court with the best approach to determine antitrust standing, and that the Court should apply those factors. Plaintiffs countered that the Court should reject any suggestion that the Court read limitations derived from federal law into state indirect-purchaser statutes in the absence of authority from the states' legislatures and courts. At oral argument, defense counsel modified their approach, and suggested that the Court ignore *AGC* particularly, or whether or not each state applies it, and focus on the following common denominators: (1) causation; (2) remoteness; and (3) injury.

At this stage of the litigation, the Court agrees with defense counsel's suggestion. This makes sense in light of the Court's indication to the parties at oral argument that it would be receptive to an amended complaint. Accordingly, the Court will grant the motion to dismiss, and instruct Plaintiffs to re-plead. In doing so, Plaintiffs need to be more specific about the plaintiffs and the product. The Court notes that some of what

plaintiffs must plead was covered in the briefs and at oral argument, but the pleadings must match the statements made by counsel in the briefs and during oral argument.

**4.      CLAIMS AGAINST UPGC**

UPGC makes three arguments why the Court should dismiss the claims against it: (1) UPGC is an agency and instrumentality of a foreign state and is thus immune from the jurisdiction of any court in the United States pursuant to the Foreign Sovereign Immunities Act (the "FSIA"); (2) antitrust immunity under the Cooperative Marketing Act ("CMA"); and (3) the act of state doctrine warrants dismissal because a foreign sovereign granted UPGC authority to engage in the acts deemed unlawful by Plaintiffs.

Although the claims against UPGC are not barred by either the FSIA or the CMA, they are barred by the Act of State Doctrine.  The Court will briefly explain why the first two arguments fail, and then explain why the claims must be dismissed under the Act of State Doctrine.

**A.      *FSIA***

Under the FSIA, a "foreign state" is immune from the jurisdiction of the federal and state courts of the United States unless it falls within an exception.  28 U.S.C. § 1604. A "foreign state" includes "a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in [§ 1603(b)]."  28 U.S.C. § 1603(a).  An agency or instrumentality of a foreign state is:

Any entity –

(1)      which is a separate legal person, corporate or

otherwise, and

(2)      which is an organ of a foreign state or political
subdivision thereof, or a majority of whose shares or
other ownership interest is owned by a foreign state or
political subdivision thereof, and

(3)      which is neither a citizen of a State of the United States
as defined in section 1332(c) and (d) of this title, nor
created under the laws of any third country.

28 U.S.C. § 1603(b). The parties dispute whether UPGC fulfills the second element. The

Court agrees with Plaintiffs that the second element is not fulfilled because UPGC is not

an organ of a foreign state.

An organ of a foreign state "engages in a public activity on behalf of the foreign

government." *Cal. Dep't of Water Res. v. Powerex Corp.*, 533 F.3d 1087, 1098 (9th Cir.

2008). In determining whether an entity is an organ of a foreign state, courts consider

whether the entity engages in a public activity on behalf of the foreign government. To

make this determination, courts examine the following factors: (1) the circumstances

surrounding the entity's creation; (2) the purpose of its activities; (3) its independence

from the government; (4) the level of government financial support; (5) its employment

policies; and (6) its obligations and privileges under state law. *Id.*; *see also Patrickson v.

Dole Food Company*, 251 F.3d 795, 807 (9th Cir. 2001). An entity may have some

autonomy from the foreign government and still be its organ. *Patrickson*, 251 F.3d at

807.

First, with respect to the circumstances surrounding its creation, UPGC asserts that

it is nothing more than a forum through which its member agencies implement the powers

granted by Canada's provinces. UPGC suggests that this case is similar to *Cal. Dep't of*

*Water Res. v. Powerex Corp.*, where the Ninth Circuit held that the circumstances

surrounding Powerex's creation weigh in favor of finding Powerex to be an organ of

British Columbia. *Powerex*, 553 F.3d at 1099. In so holding, the court explained that

Powerex was a wholly owned subsidiary of BC Hydro, which was created by the British

Columbia Hydro and Power Authority Act. Powerex owed its very existence to the

Province, which instructed BC Hydro to establish a subsidiary that would assist it with its

sovereign functions.

UPGC contends that similarly, the provincial governments created the member

agencies, and those agencies created UPGC to assist them with their sovereign functions.

The Court finds a striking difference between the two. In *Powerex*, the Ninth Circuit

explained that British Columbia's Minister of Energy, Mines, and Petroleum Resources

notified BC Hydro that the Provincial Cabinet wanted a single agency to be responsible to

market the export of power outside the province and that such an entity should be a

wholly owned subsidiary of BC Hydro. *Id*. Powerex was incorporated within a month.

*Id*.

Here, although the member agencies may have created UPGC, it does not owe its

very existence to a province. A province did not instruct or direct the member agencies to

establish UPGC or any other subsidiary that would assist it with its sovereign functions.

According to the Amended Complaint, the entire UPGA Board of Directors met with key

industry leaders in Canada and the United States, where more than 250 potato growers preliminarily approved the startup of a Canadian counterpart to the UPGA. Another meeting was later held in Toronto, Canada, where the UPGA board initiated the formation of UPGC. *Amended Complaint* ¶ 239, Dkt. 63. Accordingly, the circumstances surrounding the creation of UPGC weigh against finding that UPGC qualifies as an organ.

Second, the purpose of UPGC's activities also weighs against finding that it qualifies as an organ of government. UPGC argues that like Powerex, it helps immune entities fulfill the mission and goals dictated by Canada's provinces and statutes. However, the Ninth Circuit also noted that the Canadian province looked to Powerex to further other public policies. *Id*. at 1100. Powerex fulfills the goals of the Power for Jobs Development Act by supplying power on favorable terms to expanding businesses in British Columbia. *Id*. It also played a role in treaty formation and implementation. *Id*. All of these activities were pursued for public purposes. *Id*.

That is not the case here. The allegations in the Amended Complaint are that the purpose of UPGC's activities is to disseminate information about the production and marketing of potatoes. UPGC does not dispute this.

Next, UPGC contends that it is controlled and funded by immune government entities. UPGC argues that because it consists of immune member agencies, is controlled by those agencies, and depends upon those agencies for funds, both the third and fourth factors support a finding of organ status. UPGC focuses its argument on the member

agencies, arguing that since every member of UPGC's board of directors is a representative of an immune member agency, and because those board members are immune from suit, then UPGC should be immune from suit. UPGC also notes that the member agencies fund UPGC.

There is some merit in UPGC's argument. However, the Court cannot make the same finding as the Ninth Circuit did in *Powerex*. In that case, the court explained that Powerex was restrained by provincial regulations and directives applicable to government corporations, that the province could limit Powerex's ability to enter banking and other financial arrangements, and that Powerex's financial operations were reviewed by the province's comptroller general. The Ninth Circuit also noted that the province had sole beneficial ownership and control of Powerex.

These same indicators of government control are not present with regard to UPGC. Thus, at best this factor is a wash, and would likely tip in favor of not finding immunity were it the only factor the Court were to consider.

The final two factors, UPGC's employment policies and UPGC's obligations and privileges under state law, do not tip the scale in either direction. UPGC has one part-time employee, who is not a public servant. Employment of civil servants is indicative of an organ of government, but it is not dispositive. *Id*. at 1102. Moreover, it does not appear that any savings UPGC receives as a non-profit amounts to substantial financial support.

Based on an evaluation of all six factors, the Court finds that the scale tips

decidedly in favor of finding that UPGC is not an organ of a foreign state.

The Court is also unpersuaded by UPGC's argument that it must be deemed an organ of a foreign state because each of its underlying member agencies are, themselves, organs of a foreign state. The Ninth Circuit has explained that Congress was exceedingly conscious of the distinction between foreign states, political subdivisions, and agencies or instrumentalities of foreign states and political subdivisions. *Gates v. Victor Find Foods*, 54 F.3d 1457, 1462 (9th Cir. 1995). The Ninth Circuit further noted in *Gates* that "[a] contrary reading of the statute could expand immunity far beyond what Congress intended." *Id*.

> As it is written, the Act provides potential immunity to entities that are either organs of a foreign state or political subdivision thereof or have a majority of shares owned by the foreign state or political subdivision. To add to that list entities that are owned by an agency or instrumentality would expand the potential immunity considerably because it would provide potential immunity for every subsidiary in a corporate chain, no matter how far down the line, so long as the first corporation is an organ of the foreign state or political subdivision or has a majority of its shares owned by the foreign state or political subdivision. Although such a broad view of sovereign immunity may very well be desirable, we cannot assume that Congress intended such a result when a literal reading of the statute leads to the opposite conclusion.

*Id*. UPGC's "organ of an organ of a foreign state" argument requires just such an expansion of immunity – one which the Ninth Circuit has found to be unsupported by a literal reading of the statute. Accordingly, UPGC is not entitled to FSIA immunity.

## B.     Cooperative Marketing Act

UPGC also contends that it is immune from antitrust liability pursuant to the

CMA.  As noted previously, section 5 of the CMA immunizes individuals and entities

engaged in certain cooperative marketing activities including,

> [p]ersons engaged, as original producers of agricultural
> products, such as farmers, planters, ranchmen, dairymen, nut
> or fruit growers, acting together in associations, corporate or
> otherwise, in collectively processing, preparing for market,
> handling, and marketing in interstate and/or foreign
> commerce such products of persons so engaged, may acquire,
> exchange, interpret, and disseminate past, present, and
> prospective crop, market, statistical, economic, and other
> similar information by direct exchange between such persons,
> and/or such associations or federations thereof, and/or by and
> through a common agent created or selected by them.

7 U.S.C. § 455.

Plaintiffs do not dispute that the CMA allows certain entities to engage in

data-gathering and data-exchange, and that those entities may engage in direct

interchange of information through an association or federation. However, Plaintiffs

contend that UPGA's activities went much further and included conduct not immunized

by the CMA – specifically, participating in and facilitating supply-restriction and

price-fixing. Plaintiffs concede that UPGC collects and disseminates information, but that

is not the sole basis of the claims against them. Plaintiffs allege that UPGC conspired

with other defendants to reduce the supply of fresh and process potatoes for the purpose

of artificially inflating their price. The CMA does not apply to these allegations.

**C.     The Act of State Doctrine**

The classic statement of the Act of State Doctrine was made more than one hundred years ago in *Underhill v. Hernandez*, 168 U.S. 250 (1897), when Justice Fuller stated that "[e]very sovereign State is bound to respect the independence of every other sovereign State, and the courts of one country will not sit in judgment on the acts of the government of another done within its own territory.  Redress of grievances by reason of such acts must be obtained through the means open to be availed of by sovereign powers as between themselves." *Credit Suisse v. U.S. Dist. Court for Cent. Dist. of Cal.*, 130 F.3d 1342, 1346 (9th Cir. 1997) (Citing *Underhill*, 168 U.S. at 252). The doctrine is "meant to facilitate the foreign relations of the United States . . . ." *Republic of Philippines v. Marcos*, 862 F.2d 1355, 1361 (9th Cir. 1988).  It recognizes "the thoroughly sound principle that on occasion individual litigants may have to forgo decision on the merits of their claims because the involvement of the courts in such a decision might frustrate the conduct of United States foreign policy." *Spectrum Stores, Inc. v. Citgo Petroleum Co.*, 632 F.3d 938, 954 (5th Cir. 2011) (Internal quotations and citations omitted).

UPGC contends that the Act of State Doctrine warrants dismissal because a foreign sovereign granted UPGC authority to engage in the acts deemed unlawful by Plaintiffs.  The Act of State Doctrine bars judicial review of a claim if "(1) there is an official act of a foreign sovereign performed within its own territory; and (2) the relief sought or the defense interposed in the action would require a court in the United States to declare invalid the foreign sovereign's official act." *Credit Suisse*, 130 F.3d at 1346

(Internal brackets and citation omitted).  The burden of proving acts of state lies with the party asserting the applicability of the doctrine.  *Liu v. Republic of China*, 892 F.2d 1419, 1432 (9th Cir. 1989).

Both elements are met in this case.  First, the member agencies are foreign sovereigns which have performed official acts within their respective provinces.  UPGC has provided evidence that only the member agencies have the power to dictate price, supply, quality, quantity, and exports of Canadian potatoes, and that the member agencies created UPGC simply to facilitate their cooperation and carry out their sovereign duties. Thus, to the extent any decisions were made to reduce the supply or export of Canadian potatoes, those decisions were made by the member agencies in their sovereign capacity.

Plaintiffs raise a concern about whether UPGC can assume the status of the member agencies in this case.   But that makes no difference.  The first element of the Act of State Doctrine is whether there is an official act of a foreign sovereign performed within its own territory, not whether the named defendant is the foreign sovereign who performed that official act.  It makes no difference that the member agencies are not the named defendants in this case.  The Act of State Doctrine prevents Plaintiffs from attacking the member agencies' sovereign supply-control decisions through UPGC. Unlike the FSIA, the relevant acts include any governmental acts whose validity would be called into question by adjudication of the suit, not just the acts of the defendants. *Spectrum Stores,* 632 F.3d at 954; *see also IAM v. OPEC*, 649 F.2d 1354, 1359 (9th Cir. 1981).  Moreover, "[t]he Act of State Doctrine is not diluted by the commercial activity

exception which limits the doctrine of sovereign immunity." *IAM*, 649 F.2d at 1360; *see also Honduras Aircraft Registry, Ltd. v. Honduras*, 129 F.3d 543, 550 (11th Cir. 1997) ("[T]here is no commercial exception to the Act of State Doctrine as there is under the FSIA.").

The second element is also met. Resolving Plaintiffs' claims would require the Court to declare the member agencies' sovereign acts invalid. In order for the plaintiffs to prevail on their claims against UPGC, the Court would need to conclude that, through UPGC, the member agencies' illegally agreed to reduce the supply and export of potatoes in their respective provinces. However, UPGC has shown that Canadian law expressly empowers the member agencies to cooperate and work with each other to regulate the marketing of potatoes within their respective provinces, and Plaintiffs have provided no evidence to the contrary. Thus, the Court would be forced to declare the member agencies' sovereign acts invalid in order to grant Plaintiffs' requested relief. Accordingly, the Act of State Doctrine bars this suit against UPGC.

## 5.     Motion to Add Names to List of Custodians

Plaintiff Brigiotta's Farmland Produce and Garden Center, Inc. asks the Court to order Defendant Pleasant Valley Potato, Inc. to add Kim Wahlen to their custodian list pursuant to the Preservation Order. As explained above, Plaintiffs allege that Pleasant Valley is a founding member of UPGI, based on the related allegation that Kim Wahlen attended the Fall 2004 meeting and "signed on to" the conspiracy alleged in the complaint. However, there are no allegations in the complaint to indicate Mr. Wahlen's

relationship to Pleasant Valley, or his ability to act on behalf of that entity. Accordingly, the Court has determined that Plaintiffs have failed to allege facts connecting Pleasant Valley to the scheme outlined in the complaint and dismissal with leave to amend is appropriate.

For similar reasons, the Court will deny Plaintiffs' motion to add Kim Wahlen as a custodian. According to his affidavit, although Kim Wahlen is an owner and shareholder of Pleasant Valley, he owns a separate farm. *Wahlen Aff.*, Dkt. 142-2. He indicates that the documents for his farm are kept separate from documents for Pleasant Valley, and that he does not have control of Pleasant Valley documents. *Id.* Pleasant Valley also states that it has designated individuals within Pleasant Valley's corporate structure as record custodians, and that the entirety of Pleasant Valley's records are covered by those designations. Accordingly, there is no justification for designating Kim Wahlen as a record custodian for Pleasant Valley.

## ORDER

**IT IS ORDERED:**

1.      Defendant R.D. Offutt Co.'s  Motion To Dismiss For Failure to State Claim (Dkt. 72) is **GRANTED with leave to amend**.

2.      Defendant Pleasant Valley Potato, Inc.'s Motion to Dismiss (Dkt. 73) is **GRANTED with leave to amend**.

3.      Motion to Dismiss Claims Against Blaine Larsen, Blaine Larsen Farms, Inc., Driscoll Potatoes, Inc., and Rigby Produce Inc., (Dkt. 75) is **DENIED**.

4.     Potandon Produce L.L.C.'s Motion to Dismiss Amended Class Complaints (Dkt. 76) is **GRANTED with leave to amend**.

5.     Defendant Idahoan Foods, LLC's Motions to Dismiss Direct Purchasers' First Amended Class Action Complaint and Indirect Purchasers' First Amended Class Action Complaint (Dkt. 77) is **GRANTED with leave to amend**.

6.     Defendant United Potato Growers of Canada Motion to Dismiss (Dkt. 78) is **GRANTED**.

7.     Motion to Dismiss Claims Against Certain Defendants and Defendant Associations (Dkt. 79) is **DENIED in part** and **GRANTED in part with leave to amend**.

8.     Motion to Dismiss the Indirect Purchasers' Claims (Dkt. 82) is **GRANTED with leave to amend**.

9.     Motion to Dismiss Based on the Capper-Volstead Act and Related Statutes (Dkt. 85) is **DENIED**.

10.     Dole Food Company, Inc. And Dole Fresh Vegetables, Inc.'s Joint Motion to Dismiss Direct Purchasers' First Amended Class Action Complaint and Indirect Purchasers' First Amended Class Action Complaint (Dkt. 88) is **GRANTED**.

11.     Plaintiff Brigiotta's Farmland Produce and Garden Center, Inc.'s Motion to

Add Names to Defendant Pleasant Valley Potato, Inc.'s List of Custodians (Dkt. 120) is **DEEMED MOOT**.

12.     Plaintiff Brigiotta's Farmland Produce and Garden Center, Inc.'s Corrected Motion and Memorandum in Support to Add Names to Defendant Pleasant Valley Potato, Inc.'s List of Custodians (Dkt. 122) is **DENIED**.

13.     Plaintiffs shall file their amended complaints on or before **January 13, 2012**.

DATED:  **December 2, 2011**

B. LYNN WINMILL
Chief U.S. District Court Judge